IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| William Boykin, *et al.*   ) | Civil Action No. 10-01790 (PLF) |
| ) | |
|    Homeless persons living on   ) | |
|    the streets of the District of Columbia   ) | |
| ) | |
|         PLAINTIFFS   ) | |
|   vs.   ) | |
| ) | |
| Adrian Fenty,   ) | |
| in his Individual and Official Capacities   ) | |
| 1350 Pennsylvania Avenue, NW   ) | |
| Washington, DC 20004   ) | |
| ) | |
|         DEFENDANT   ) | |

**PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT AND MOTION TO DISMISS**

**I.   INTRODUCTION**

Plaintiffs are African American and Hispanic men that formerly resided at La Casa shelter, 1436 Irving Street, NW, Washington, DC. This was the last public low barrier shelter in Ward 1. The remaining public low barrier shelters are located in Ward 5 and 8. Plaintiffs have been recipients of mental health and other vital services in the La Casa area, and the District has established an infrastructure of these services to provide mental health and other services for the homeless. Evidence has been presented by Plaintiffs regarding their inability to receive access to these services since the shelter has been closed. Evidence has also been provided of the segregation of the disabled and predominantly minority population of Plaintiffs to the poorest and most violent parts of the District, as well as for the growing and unmet needs for shelter in the District, now placing those who are most vulnerable at growing risk of harm. Plaintiffs have provided

evidence of hospitalization from harm incurred after the shelter has been closed, including incidents where former residents are now forced to walk many miles to receive services, or to spend the nights in the streets and other public spaces in the former La Casa area, where the services are being provided.[1]  Former residents and Plaintiffs include stroke victims, those hospitalized for foot and leg injuries due to walking long distances.  Evidence is now surfacing of increased exposure to violence since the displacement of former La Casa residents to the areas where the remaining shelter is located, which areas are violent, isolated, and have the highest unemployment, poverty and incarceration rates in the District.

The District, in its motions for dismissal or in the alternative for summary judgment, argues that the closure of La Casa shelter, and the displacement of its residents has not had a disparate impact on a protected class because the population of persons affected by the shelter's closure essentially mirrors the population served in the shelter system at large.  The District also argues that Plaintiffs' complaint is based on philophical and policy disagreements with the new operational design of the shelter system, that they have suffered no injuries, have failed to allege sufficient facts to demonstrate qualification as disabled under the American with Disabilities Act ("ADA"), the Fair Housing Act ("FHA"), or the D.C. Human Rights Act 9"DCHRA"), and that they cannot sustain "place of residence discrimination" claims because they do not satisfy residency requirements statutes at issue, and they did not attempt to buy housing, as required under the FHA.

---

[1] The evidence submitted previously and of record, including but not limited to the evidence submitted in Plaintiffs' Reply to Opposition, filed December 6, 2010, is hereby incorporated by reference in its entirety.

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. F.R. Civ. P. 56(c). "Material facts are those that might affect the outcome of the suit under governing law; genuine issues are those in which the evidence before the court is such that a reasonable trier of fact could find for the moving party." *Hendricks v. Geithner*, 568 F.3d 1008, 1012 (D.C. Cir. 2009. Summary judgment is not appropriate when there are genuine issues of material fact. Defendant has failed to present sufficient evidence to meet their burden of showing there is no issue of material fact regarding the pending allegations. Here, Defendant makes assertions of fact in their declarations and Memorandum of Points and Authorities in Support of Defendant's Motion to Dismiss or Motion for Summary Judgment. But these assertions are not supported by any evidence offered in Defendant's statement of material facts or declarations.

**II.   CONTRARY TO THE DISTRICT'S ASSERTIONS, THE PERMANENT SUPPORTIVE HOUSING PROGRAM DOES NOT ADEQUATELY ADDRESS THE NEEDS FOR SHELTER AND SHOULD NOT BE PITTED AGAINST THE INTERIM NEED FOR LOW BARRIER SHELTER IN COMMUNITIES THROUGHOUT THE DISTRICT, INCLUDING COLUMBIA HEIGHTS**

In contradiction to the repeated assertions made by District in the pleadings and accompanying declaration filed with the District's opposition on November 29, 2010, the District, in separate pleadings, has admitted that it cannot afford to house all that are mentally ill and in need of housing. In addition, by all measures, recent statistics clearly reflect a growing and unmet need for shelter which cannot be compensated for or matched in the short-term by the PSH program. The numbers of homeless are increasing. See Community Partnership for the Prevention of Homelessness at

http://www.community-partnership.org.  And, according to the Metropolitan Area Counsel of Government's May report, the number of unsheltered homeless has increased between five to ten percent since last year.  Anecdotal accounts provided as evidence by Plaintiffs not only confirm this statistical picture, but also reveal circumstances more injurious to the health and safety of greater numbers of homeless persons than are indicated in the report.  Recent newspaper accounts report overcrowding at District's family shelters as well, leaving some families with children either on the street or living in uninhabitable conditions.  Men's shelters paint a similar picture.  See, *e.g.* Pl. Ex. 1, filed Dec. 6, 2010, illustrating the rise of homemade shelters in the Columbia Heights area.  See also Pl. Ex. 2, filed Dec. 6, 2010, which included affidavits of persons now sleeping on the streets since La Casa's closing.  See also *Nowhere to go:  As DC housing costs rise, residents are left with fewer affordable housing options*, D.C. Fiscal Policy Institute, Feb. 5, 2010, Avail. at www.dcfpi.org.  See also *D.C. General's Family Shelter Back at Capacity*, City Desk of Washington City Paper, June 8, 2010.

The district's own pleadings reflect the need for ongoing low barrier shelter in the interim in Columbia Heights area due to a scarcity of available housing for the mentally disabled.  In support of its motion to vacate a December 12, 2003 Consent Order and to dismiss action for violating the Erwin Act by failing to provide community-based alternatives to institutionalizing the mentally ill, the District admitted recently that housing 70% of its consumers in the mental health system is currently "impossible to achieve" because that would unrealistically require "an inexhaustible supply of available, low-cost housing" which is currently lacking in the District.  The District blatantly states here that it "cannot defy economic reality to create additional housing on such a massive

4

basis as to comply fully" with the court's criterion for lifting oversight. See Pl. Ex. 5, filed Dec. 6, 2010, Excerpts from Civil Action No. 74-385 (TFH), Memorandum in support of motion to dismiss at page 7, filed September 4, 2009. This admission, combined with the undeniable realization of the numbers of homeless now attempting to gain access to overcrowded shelters in the District, together negate the assertion that PSH is a feasible short-term strategy to eradicate the need for low barrier shelter, including for those suffering from mental health disabilities.

**III.   CONTRARY TO DEFENDANT'S ASSERTIONS, THE CLOSING OF LOW BARRIER SHELTERS WHILE THE ACUTE NEED STILL EXISTS IS IN CONFLICT WITH THE GOALS ENVISIONED BY THE DRAFTERS OF HOMELESS SERVICES REFORM ACT ("HSRA") TO END HOMELESSNESS IN THE DISTRICT BY 2014**

Since the closing of the La Casa Shelter, the former residents have been deprived of the ability to reasonably access shelter, forced to live on the street or attempt to stay at overcrowded shelters in some of the most dangerous and isolated parts of the city. See Pl. Ex. 2, filed Dec. 6, 2010. The closing of low barrier shelters while the acute need still exists is in conflict with the goals envisioned by the drafters of Homeless Services Reform Act ("HSRA") to end homelessness in the District by 2014.

The HSRA, D.C. Code § 4-751 *et seq*, was passed in 2005. The purpose of the Act was "to reaffirm the District of Columbia's commitment to addressing the problem of homelessness." Homeless Services Reform Act of 2005, D.C. Law 16-35 (2005). The Act was introduced as part of then Mayor Anthony Williams' plan entitled "Homeless No More: Strategic Plan for Ending Homelessness in Washington, D.C. by 2014" ("Mayor's Plan"). *Homeless No More: A Strategy for Ending Homelessness in Washington, D.C. by 2014* (Sep. 2004), *available at*

http://ich.dc.gov/ich/lib/ich/pdf/homeless_no_more_final_v1.pdf. The stated vision of the Mayor's Plan was "to improve the quality of life for all residents of the District of Columbia by preventing and ending homelessness within ten years." *Id.* at 2. The Mayor's Plan stated:

> When there are no more men and women living in the streets of Washington, D.C., when every chronically homeless person has been housed, when every person or family facing a housing crisis can find immediate help to stay in their home, and when every person or family that does lose their home can find a decent place to stay for a short while – in neighborhoods all across the city – then homelessness as we now know it will be ended and the objectives of this plan will have been achieved.

*Id.* at 5. The Mayor's Policy Academy Team recommended a twofold action of "making substantial, immediate investments to improve the existing services for homeless people . . . while launching long-term strategies designed to end homelessness." *Id.* at 2. One of the stated goals of the Plan was "meeting immediate shelter and housing needs," by **building new facilities and creating better shelters** and supportive housing." *Id.* at 18. (emphasis added). The Act was thus intended as an instrument by which to realize the objectives of the Mayor's Plan,[2] particularly to end homelessness and provide "shelter to meet the housing needs of individuals and families who are homeless." D.C. Code § 4.753.01(b)(3)A. The HSRA included both short-term and long-term strategies to end homelessness. One of the short-term strategies included in the Act was severe weather shelter, **low barrier shelter**, and temporary shelter. *Id.* (emphasis added). A long-term strategy outlined in the HSRA was to provide supportive housing to meet the long-term housing needs of homeless individuals and families. *Id.* § 4.753.01(4).

---

[2] The Mayor's plan lists finalizing and passing the HSRA as one of the strategies to realize the goal of ending homelessness by 2014. *Id.* at 6.

So, contrary to Defendant's repeated assertions, PSH was never intended to be used as an excuse for displacing the homeless from the low barrier shelters before the needs of the inhabitants have been met, nor was this program intended to hurriedly displace the homeless from the most affluent parts of the District to parts of the city which lack accompanying resources or employment opportunities: PSH programs were never intended to be mutually exclusive with the existence of low barrier shelters. The evidence submitted herewith and of record clearly shows the need for both PSH and low barrier shelter throughout the city, and the lack of feasibility to realistically replace the need for low barrier shelter with PSH under the current prevailing economic conditions.

Plaintiffs challenge both the authority and expertise of Fred Swan in his blanket assertions that reopening low barrier shelter in Ward 1 is not economically feasible See Swan decl. Filed Nov. 29, 2010. No feasibility studies have been performed or provided as evidence. Plaintiffs therefore challenge Mr. Swan's unfounded assertions that the need for low barrier shelter has been satisfied by the PSH program. Mr. Swan has neither the professional capacity nor the credentials for making such blanket statements, and has provided no legally sufficient documentation for his assertions.

**IV.   PLAINTIFFS SATISFY THE DEFINITION OF DISABLED UNDER THE ADA**

The Supreme Court, in *Olmstead v.* L.C., 527 U.S. 581 (1999), unambiguously held that the state has an obligation to administer services to those with diverse mental disabilities with an even hand. The reasons for this requirement are clearly stated in the ADA, since "individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion… failure to make modifications

to existing facilities and practices,… [and] **segregation**…" 42 U.S.C. §§ 12101(a)(2), (3), (5) (emphasis added).

The ADA defines disability with respect to an individual as a physical or mental impairment that substantially limits one or more of the major life activities of such individual… or being regarded as having such an impairment § 12102(2). Title II's definition states qualified individuals with disabilities as

> an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirement for the receipt of services or the participation in programs or activities provided by a public entity.

§ 12131(2).

According to the Supreme Court, the preamble to the Title II regulations defines "the most integrated setting" appropriate to the needs of qualified individuals with disabilities to mean a "setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible." Olmstead at 6, citing 28CFR pt. 35, A;;. A, p. 450 (1998). The court in *Olmstead* also sought assurance against the state's "unjustified isolation of individuals with disabilities." (*Olmstead* at 12). The District is in violation of the ADA when applying these standards clearly set forth by the Supreme Court. The District by its actions has segregated the disabled population by removing low barrier shelter from places where services exist, to places with the least services available.

The evidence of record shows that Plaintiffs have participated in and attempt to continue to participate in mental health and other programs established for the homeless

8

in Columbia Heights (Hermano Pedro) and nearby Mount Pleasant (Neighbors Consejo). The evidence also shows that Plaintiffs are now forced to choose between sleeping on the streets in the areas from which they have been displaced, or walking long distances in order to attempt to continue receiving mental health and other services provided in the Columbia Heights/Mt. Pleasant area.  Pl. Ex. 2 and 4, filed Dec. 6, 2010.

Discrimination necessarily requires uneven treatment of similarly situated individuals.  According to the Supreme Court,

> Congress explicitly identified unjustified segregation of persons with disabilities as a form of discrimination.  (See § 12101(a)(2) ("historically society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem.) § 12101(a)(5).

*Olmstead* at 588, 589.  The tendency of uneven treatment is clearly evident in the District's treatment of Plaintiffs and former La Casa residents.  In this case, individuals with mental and physical disabilities have been displaced from their communities, placed in parts of town that are foreign to them, wrought with language barriers, and which areas have the least services for addressing their mental and physical disabiltities, and which areas offer little or no opportunities for work or proper nourishment.  Plaintiffs and former La Casa residents are indigent and must now walk for miles to reach mental health and other services crucial to their wellbeing.  (see declarations….).

The evidence of record clearly shows that effective mental health services serving the plaintiffs have been soundly established in the Columbia Heights area from which Plaintiffs have been displaced.  The District has readily admitted this in its pleadings in support of its motion to vacate a December 12, 2003 Consent Order and to dismiss action

for violating the Erwin Act by failing to provide community based alternatives to institutionalizing the mentally ill.  See Decl. of Stephen T. Baron, Director of DMH, at pages 9-10 in Civil Action No. 74-385 (TFH), Memorandum in support of motion to dismiss, filed Sept. 4, 2009, Excerpts provided as Pl Ex. 5, filed Dec. 6, 2010.

> In FY 08, DMH awarded a contract to Catholic Charities at Hermano Pedro Day Program, located in the Columbia Heights area of the District, to increase services to homeless individuals.  As required by Exit Criteria 13 and 16, DMH memorialized its strategy for serving the homeless and mentally ill in a plan, which was approved by both the Court Monitor and the Dixon plaintiffs' counsel.  As a result of all of these services, exit Criteria 13 and 16 relating to homeless services have been moved to inactive status.

Former La Casa residents include a significant population of Hispanic men.  Pl. Ex. 2, filed Dec. 6, 2010; see also Third Amended Complaint, filed Dec. 9, 2010.  Columbia Heights and the general area of north Ward 1/south Ward 4 is well known to host a thriving Hispanic community, offering services which overcome language barriers that former La Casa residents now must face upon their displacement to Wards 5 and 8.  See Pl. Ex. 4, filed Dec. 6, 2010.

What's more, the job opportunities provided in Ward 1 to and the surrounding area are lacking in the areas that former La Casa residents are now forced to live.  For instance, the displacement of the already marginalized homeless Hispanic population that had stayed at La Casa, and which had found work in their community, undermines their efforts for self-determination.  Pl. Ex. 2 and 4, filed Dec. 6, 2010.  The services and job opportunities once made easily accessible to those with mental and other disabilities are now far from the remaining low barrier shelters.  As shown above, by the District's own admission, Columbia Heights has served as a hub for mental health services, including

but not limited to provision to the Latino population which formerly resided at La Casa. Replacing shelter to the community where it was recently removed would therefore not fundamentally alter the state's activity.

V.     **RESIDENCY REQUIREMENTS ARE SATISFIED BY FORMER LA CASA RESIDENTS**

Courts have held that the FHA does not require a dwelling to be a permanent residence. To this end, many courts have held homeless shelters covered by the FHA. *See Turning Point v. City of Caldwell*, 74 F.3d 941 (9th Cir. 1996) (holding homeless shelter covered by FHA); *Woods v. Foster*, 884 F. Supp. 1169, 1174 (N.D. Ill. 1995) (homeless shelter for women and their children covered by FHA); *Vilegas v. Sandy Farms, Inc.*, 929 F. Supp. 1324, 1327 (D.Or. 1996) (housing for migrant farm workers covered by FHA). In consideration of this issue, courts draw a distinction between persons who expect to return to a location as opposed to transient guests such as persons staying at a hotel. The general analysis simply considers whether a person intends to return to a location as distinguished from one of temporary sojourn or transient visit. *United States v. Hughes Memorial House*, 396 F. Supp. 544, 548-49 (W.D. Va. 1975).

The evidence of record supports the conclusion that Plaintiffs had stayed at La Casa for extended periods of time and had expected to return for future nights. See Pl. Ex. 2, filed Dec. 6, 2010. The record also clearly shows that Plaintiffs and other former residents have routinely received supportive services within three blocks of La Casa. *Id.* Defendant's argument that La Casa Shelter is somehow outside the ambit of the FHA lacks merit and any factual support.

VI.    **STATISTICAL EVIDENCE CLEARLY REVEALS A DISPARATE IMPACT ON VULNERABLE AND MINORITY POPULATIONS IN THE DISTRICT**

Contrary to defendant's assertions, statistical evidence clearly reveals a pattern of disparate impact on vulnerable and minority populations in the District. A comparison of statistics based on census tracts provides an astounding picture of race and income disparities between the places where shelters have closed, and where they now remain.

Census track 27.01 in Ward 1, where La Casa residents formerly resided, comprises 32% Blacks, 32% Whites, 28% Hispanics, 17% poverty rate and 5.9% unemployment rate. Pl. Ex. 3. pages 5-7, filed Dec. 6, 2010.

Census tracks 1 and 51, representative of Ward 2, where low barrier shelter had been removed prior to the closing of La Casa, comprise the following statistics: Track 1 comprises 4.8% Blacks, 86% Whites, 4.1% Hispanics, 5.2% poverty rate, and 1.9% unemployment rate. See Pl. Ex. 3, pages 8-10. Track 51 comprises 25% blacks, 59% Whites, 13% Hispanics, 9.4% poverty rate, and 4.3% employment rate. Pl. Ex. 3, pages 11-14, filed Dec. 6, 2010.

Census track 17.04, where the 801 Shelter is located in Ward 8, comprises 99% Black, 0% White, 0.2% Hispanic, 63% poverty rate and 50% unemployment rate. Pl. Ex. 3, pages 15-17, filed Dec. 6, 2010.

Census tracks for the Ward 5 shelters have not been determined at the time of filing, but Ward 5 comprises 86% Black, 11% White, 1.4% Hispanic, 20% poverty rate, 15% unemployment rate according to the 2000 Census. Pl. Ex. 3, pages 18-20, filed Dec. 6, 2010.

The homeless, which by the District's own admission comprises a larger percentage of mentally disabled, are forced now to live in discrete pockets of Wards 5

12

and 8, significantly concentrating this disabled and predominantly minority population in the poorest areas of the city.

Contrary to Defendant's allegations, these statistics clearly show the systematic removal of a population that is over 80% minority, and largely disabled, from wards highest in Caucasian population, highest in income, and lowest in poverty, to wards which are highest in minority population, and which areas have the highest illiteracy rates, as well as the highest incarceration, unemployment and high school drop-out rates. The forced relocation of the poor and the disabled to poor, predominantly African American parts of the District from more affluent, predominantly Caucasian parts of the city is a form of residence discrimination, and results in the exacerbating segregation of the disabled and minority population of the District.  Contrary to the District's assertions, a clear pattern of state sponsored segregation of a predominantly minority, disabled population clearly exists, in violation of the FHA, ADA and DCHRA.

VII. **THE DISRUPTION AND SEGREGATION OF ACCESSIBLE SERVICES FOR THE DISABLED VIOLATES THE HSRA & THE ADA**

The HSRA provides that an administrative hearing be made available to a client or representative thereof who wishes to challenge certain decisions.  D.C. Code § 4-754.41(a).  A client or representative may request a hearing to obtain any legally available and practicable remedy for an alleged violation of the provider standards listed in §§ 4-754.21-4-754.25 or the client rights listed in §§ 4-754.21-4.754.12, including the denial of a request by an individual with a disability for a reasonable accommodation or modification of policies or practices.  DC Code § 4-754.41(b).  And while this language does not expressly grant a client a right to an administrative hearing to challenge a

decision by a provider of shelter services to terminate those services, subsection (b)(3) undoubtedly allows a client to have a hearing to obtain a remedy if any provider of services, including a shelter, violates either the standards for providers established in §§ 4-751.21 through 4-754.25, or the client rights established in §§ 4-754.11 and 4-754.12.

The Department of Human Services (DHS), as the Mayor's designee, must "offer the client or client representative an opportunity for an administrative review by the Department of the decision that is the subject of the fair hearing request." The provisions of the Act leave no doubt about the Council's intent that client that is discharged from a shelter has a right to a hearing to review the shelter's decision to terminate its services. § 4-754.11. The fair hearing provision contains an express recognition of the right to a fair hearing proceeding (§ 4-754.41(d)), and recipients of shelter and supportive housing, while being excluded from the hearing right granted by § 743.41(b)(2), <u>are given the right to a stay pending completion of a fair hearing proceeding</u>.

The Act expressly provides for a client's right to a hearing DC Code §§ 4-754.41(b)(1) and 4-754.42(d)(2)(D)(v). And, by providing a stay of the termination of shelter services pending the outcome of fair hearing proceedings, the Act implicitly provides that such proceedings must be available in shelter termination cases. See §§ 4-754.11 and 754.41(d). What's more, HSRA explicitly requires DHS to reinstate a client's access to the services received prior to the issuance of the order, pending the outcome of a hearing pursuant to §§ 4-754.41 and 4-754.42. DC Code § 4-754.38(e). Accord *Paschall v. District of Columbia Dep't of Health*, 871 A.2d 463 (D.C. 2005).

VIII.  **DESPITE DEFENDANT'S ASSERTIONS, NO BINDING LEGAL DOCUMENTS ENSURE THE RETURN OF LA CASA TO COLUMBIA HEIGHTS**

The District, in opposing the reopening of low barrier shelter in downtown DC and in the Ward 1, Columbia Heights area, assures plaintiffs that no pattern of displacement exists because homeless facilities will be restored to that area. The contradictions in the evidence provided by the District, however, undermine any credibility or assurance that shelter facilities will in fact be restored to Columbia Heights. The District appears to be providing contradictory evidence concerning where the La Casa homeless facilities will be located, who currently owns that land, how it will be conveyed, and whether the city will have funds to actually complete this endeavor. See, e.g., page 1, ¶ 3 of Amendment to Land Disposition and Development Agreement and Assignment Agreement with Respect to the West Parcel (hereinafter "Amendment to Land Disposition"), Def. Ex., filed Nov. 29, 2010, where the First LDA Amendment "set forth certain amendments to the LDA and bifurcated the disposition of the Property to allow for the relocation of the homeless shelter located on the West Parcel…prior to conveyance of the West Parcel to the Developer." See also page 2, third full paragraph of this amendment:

> Whereas, the Assignee has requested and the District has agreed to proceed with the conveyance of the West Parcel (as amended) to the Developer prior to the relocation of the homeless shelter and to otherwise amend certain terms of the LDA and the First LDA Amendment as applicable only to the West Parcel…"

And compare this to the following text **which has been deleted**, ¶ 8 on page 3

> At closing, Assignee shall accept the West Parcel subject to the La Casa Shelter home shelter facilities ("La Casa Shelter") which currently occupy a portion of the West Parcel and ISS Parcel. The District and Assignee agree to work together to relocate La Casa Shelter by June 30, 2009.

15

and ¶ 10 on the top of page 4 of the Amendment to Land Disposition, which together delete any language setting forth time constraints or assurances as to the construction of the shelter's replacement.  The deleted language reads:

> Developer shall achieve Commencement of Construction on or before the date which is one (1) year after the date that the La Casa Shelter vacates the Property and shall diligently pursue completion of the improvements such that Completion of Construction shall occur on or before the date that is twenty-eight (28) months after the date that the La Casa Shelter vacates the Property.

It is also entirely unclear whether any land which will host the proposed future homeless facilities has in fact been conveyed to the District, after the District's conveyance of the former La Casa property for $10.00.  See, e.g. Final Report for Z.C. 07-02, January 25, 2008, Def. Ex. Filed Nov. 29, 2010, at last full paragraph on page 4 which states that the Community Based Residential Facility "will be constructed separately by the District of Columbia government, on former RLARC land **donated back to the District by the applicant**. (emphasis added).  It is unclear, however, if that conveyance has ever occurred.

Plaintiffs therefore remain doubtful as to the District's intentions, and as to the District's binding obligations, and the ultimate validity of any verbal or written assurances made by the District regarding the return of homeless services to Columbia Heights.  This is in light of the apparent contradictions of record noted in the foregoing paragraphs, and the uncertainties illustrated by the trail of deletions and amendments regarding its location and timeframe for completion.  Plaintiffs are also wary of the ultimate ambiguity enshrined in this conveyance by the anti-deficiency clause, now

16

incorporated into the documents of conveyance. See Amendment to Land Disposition at page 5, ¶ 15, which states in part that

> The District's authority to make such obligations is and shall remain subject to the provisions of … D.C. Official Code Section 47-105; (iii) the District of Columbia Anti-Deficiency Act… as the foregoing statutes may be amended from time to time....

**NO TRANSPARENCY, ACCOUNTABILITY OR CREDIBLE EVIDENCE HAS BEEN PROVIDED BY CITY OFFICIALS FOR THE PSH PROGRAM**

While the PSH concept to end homelessness, with respect to the Mayor's ten year plan to end homelessness, is to be applauded for its earnest and ongoing attempts to eradicate the need for low barrier shelters and supportive services, this program is in the very early stages of development. The statistics clearly indicate that the amount of supportive housing allotted cannot keep pace with the immediate needs for low barrier shelter. Because of this undeniable fact, one program should not be pitted against the other. Instead, the PSH program should work in synchrony, not at odds with low barrier shelter programs, and accompanying services made available for both programs, in non-segregated, city-wide community settings.

What is troubling about Mr. Swan's assertions concerning the 95% success rate of the PSH program, however, is that no objective monitoring or tracking of the program has even been provided by city officials, despite repeated requests and despite the large amounts of public money involved in the program. Anecdotal evidence has surfaced over the past two years suggesting a lack of proper oversight, and incidents have occurred PSH participants were placed in drug and crime ridden areas, and experienced physical harm. Anecdotal evidence has surfaced about men losing their apartments for various reasons, and men have been found dead in housing due to smoke inhalation. Persons

have reportedly fallen through the cracks of the system due to a lack of adequate and accessible accompanying services.  No records or accountability have been provided by city officials regarding the allotting of contracts to providers, what criteria were used in awarding contracts to providers, or what standards were required and what supervision and oversight exist for determining the competence of providers.  It is unclear what roles and salaries providers have been allotted, and what record keeping they are required to maintain.  No transparency has been provided by city officials regarding the attrition rates of PSH.  The District has admitted it does not report when an apartment has been vacated by one recipient and immediately filled by another.  No records tracking attrition rates or success rates have ever been made public since the program's inception.  It is therefore unclear from which sources Mr. Swan derives his data for determining success rates.

**CONCLUSION**

For the foregoing reasons, Defendant's motions for a summary judgment and dismissal should be denied.

December 10th, 2010                                        Respectfully submitted,

/JANE ZARA/
JANE ZARA, ESQ.
DC Bar # 982392
1611 Monroe St., NW
Washington, DC  20010
202-483-9303
jjzara@aol.com
*Counsel for Plaintiffs*