UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
WILLIAM BOYKIN, et al.,                 )
                                        )
          Plaintiffs,                   )
                                        )
     v.                                 )      Civil Action No. 10-1790 (PLF)
                                        )
VINCENT GRAY,                           )
                                        )
          Defendant.[1]                 )
_____ )

OPINION

        This matter is before the Court on the defendant's motion to dismiss or, in the

alternative, for summary judgment, and the plaintiffs' motion to amend their complaint.  After

careful consideration of the parties' filings, the relevant legal authorities, and the entire record in

this case, by Order of September 28, 2012, the Court granted the defendant's motion to dismiss,

granted the plaintiffs' motion to amend, and dismissed all but one count of the amended

complaint.  See Order (Sept. 28, 2012).  This Opinion explains the reasoning behind that Order.[2]

_____

        [1]     Mayor Vincent Gray has been substituted as the defendant for former Mayor
Adrian Fenty pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.  See Order at 1 n.1
(Sept. 28, 2012).  While Mayor Fenty was sued in both his individual and official capacities, the
plaintiffs have not targeted any particular action by former Mayor Fenty but focus only on actions
by the District of Columbia government.  See Opinion at 3 n.2 (Dec. 17, 2010).  Accordingly,
Adrian Fenty has been dismissed as a defendant in this case.

        [2]     The papers reviewed in connection with this matter include the following:
plaintiffs' motion to amend ("Mot. Am.") [Dkt. No. 68]; defendant's opposition ("Opp. Am.")
[Dkt. No. 69]; plaintiffs' reply ("Reply Am.") [Dkt. No. 71]; defendant's motion to dismiss
and/or motion for summary judgment ("MTD") [Dkt. No. 29]; plaintiffs' opposition to that
motion ("Opp. MTD") [Dkt. No. 34]; defendant's reply ("Reply MTD") [Dkt. No. 46]; plaintiffs'
proposed second amended complaint ("2d. Am. Compl.") [Dkt. No. 68-1] and the exhibits
attached thereto; and plaintiffs' current amended complaint ("Am. Compl.") [Dkt. No. 15].

# I.  BACKGROUND

This action was commenced in October 2010 on behalf of nine individual plaintiffs who formerly inhabited La Casa Shelter, an emergency, low-barrier housing facility for the homeless that was located in the Columbia Heights neighborhood of the District of Columbia.  Am. Compl. ¶¶ 2-14.  La Casa, the facilities of which consisted of portable trailers, was operated by a contractor of the District of Columbia until October 15, 2010, when the shelter was closed at the direction of the District.  See Memorandum Opinion and Order at 2 (Aug. 3, 2011).  The District says that its closure of La Casa was part of its efforts to expand its Permanent Supportive Housing ("PSH") program, which involves the placement of chronically homeless individuals in permanent housing where they can gain access to long-term supportive services.  Id.  According to the plaintiffs, the District uses the PSH program "as an excuse for closing the shelters in the predominantly white parts of the city."  Id.  The plaintiffs brought claims of discrimination based on race, disability, and place of residence under the Fair Housing Act, 42 U.S.C. §§ 3601 et seq., the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq., and the District of Columbia Human Rights Act, D.C. Code §§ 2-1401.01 et seq., alleging that the District is "systematically removing persons who are disabled, indigent, and predominantly minority" from areas inhabited by "the most affluent, white populations" in the city, and placing those homeless individuals in poorer neighborhoods "with the least resources available."  Id. at 2-3.  In support of these claims, the plaintiffs have noted that La Casa was the "last remaining public shelter in Ward 1" and that Wards 2, 3, and 4 of the District already lacked public shelters. Id.

The plaintiffs' complaint was accompanied by a motion requesting a temporary restraining order and both preliminary and permanent injunctive relief.  <u>See</u> Plaintiffs['] Motion for Temporary Restraining Order, Preliminary and Permanent Injunctions [Dkt. No. 11]. Treating the motion as a request for an immediate temporary restraining order, a motions judge promptly denied it, stating that the plaintiffs' asserted injuries "provides no basis for entering an emergency injunction before the District may be heard on the matter."  Memorandum and Order at 2 (Oct. 22, 2010).  The plaintiffs filed an amended motion in November 2010, seeking preliminary injunctive relief.  This Court denied that motion upon concluding that the plaintiffs had not satisfied the four-part standard necessary to obtain such relief.  <u>See</u> Opinion (Dec. 17, 2010).  In particular, the Court found no substantial likelihood that the plaintiffs were likely to succeed on their claims.  <u>Id</u>. at 6-11.

In December 2010, the District of Columbia filed its motion to dismiss or, in the alternative, for summary judgment.  Over the next several months, however, the plaintiffs filed four separate motions to amend their complaint, which they already had amended once as of right.[3]  Explaining that it did not intend to review four separate and likely redundant motions, the Court denied without prejudice the motions to amend and directed the plaintiffs instead to file a single motion specifically identifying all proposed changes to the complaint.  <u>See</u> Memorandum

---

[3]       The plaintiffs also filed a motion to reconsider the Court's denial of the plaintiffs' motion for a preliminary injunction, a motion for leave to file a reply out of time, a motion for leave to file documents under seal, two motions for discovery, and one motion "to supplement the record" — prompting the District to file a motion to preclude the plaintiffs from filing further motions without the Court's leave, which the Court denied without prejudice.  <u>See</u> Memorandum Opinion and Order (Aug. 3, 2011).

Opinion and Order at 3-4 (Aug. 3, 2011).  The plaintiffs subsequently filed their pending motion to amend.

In their proposed second amended complaint, the plaintiffs seek to add thirty-three new plaintiffs to the action, to provide additional information relating to their claims, and to add two new claims, arising under the District of Columbia's Homeless Services Reform Act, D.C. Code § 4-751 *et seq.*, and the Due Process Clause of the United States Constitution.  Mot. Am. at 2, 5-7; see 2d Am. Compl.[4]  The District opposes the plaintiffs' motion, arguing that the proposed amendment is futile.

## II.  LEGAL STANDARDS

"Whether to grant a motion to amend is within the sound discretion of the district court."  Gerlich v. United States DOJ, 828 F. Supp. 2d 284, 290-91 (D.D.C. 2011).  Under Rule 15(a) of the Federal Rules of Civil Procedure, a court should "freely give leave" to amend a pleading "when justice so requires."  FED. R. CIV. P. 15(a).  "However, a district court may properly deny a motion to amend if the amended pleading would not survive a motion to dismiss."  In re Interbank Funding Corp. Sec. Litig., 629 F.3d 213, 218 (D.C. Cir. 2010) (citing Foman v. Davis, 371 U.S. 178, 182 (1962)); accord Nat'l Wrestling Coaches Ass'n v. Dep't of Educ., 366 F.3d 930, 945 (D.C. Cir. 2004).  Where granting a motion to amend would "waste time and judicial resources" because the complaint "must fail, as a matter of law, in light of the record in the case," justice does not require permitting amendment.  Ross v. DynCorp, 362 F.

---

[4]     Because the plaintiffs' motion to amend and supporting memorandum are combined within the same filing but not separately paginated, the page numbers used here for those documents refer to the page numbers generated by the Court's ECF system.

Supp. 2d 344, 364 n.11 (D.D.C. 2005).  "In other words, if the proposed amendment would still render the complaint deficient, courts need not grant leave."  S.K. Innovation, Inc. v. Finpol, 854 F. Supp. 2d 99, 106-07 (D.D.C. 2012).  Leave to amend also may be denied based on "undue delay, bad faith, undue prejudice to the opposing party, [or] repeated failure to cure deficiencies." Richardson v. United States, 193 F.3d 545, 548-49 (D.C. Cir. 1999).

Rule 12(b)(6) allows dismissal of a complaint if a plaintiff fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests[.]'" Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).  Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion to dismiss, id., the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quotations omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." In re Interbank Funding Corp. Sec. Litig., 629 F.3d 213, 218 (D.C. Cir. 2010) (quoting Ashcroft v. Iqbal, 556 U.S. at 678).  The Court "must accept as true all of the factual allegations contained in the complaint." Erickson v. Pardus, 551 U.S. 89, 94 (2007); see also Bell Atlantic Corp. v. Twombly, 550 U.S. at 555.  The complaint "is construed liberally in the [plaintiff's] favor, and [the Court should] grant [the plaintiff] the benefit of all inferences that can be derived from the facts alleged." Kowal v. MCI Commc'ns Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994).  Nevertheless, the Court need not accept inferences

drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept the plaintiff's legal conclusions.  See id.; Browning v. Clinton, 292 F.3d 235, 242 (D.C. Cir. 2002).

In deciding a motion to dismiss under Rule 12(b)(6), the Court "may consider the facts alleged in the complaint, documents attached to the complaint as exhibits or incorporated by reference, and matters about which the [C]ourt may take judicial notice." Cole v. Boeing Co., 845 F. Supp. 2d 277, 283 (D.D.C. 2012) (citing Abhe & Svoboda, Inc. v. Chao, 508 F.3d 1052, 1059 (D.C. Cir. 2007)).  "In determining whether to dismiss, courts treat documents attached to a complaint as if they are part of the complaint." In re Cheney, 406 F.3d 723, 729 (D.C. Cir. 2005) (citing EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624-25 (D.C. Cir. 1997)).[5]

---

[5]     The plaintiffs have attached seventeen exhibits to their proposed complaint, including declarations from certain plaintiffs and from other former residents of La Casa, government reports, census data, news articles, photographs, and other matter.  See 2d Am. Compl., Exhs. 1-17 [Dkt. Nos. 68-2, 68-3].  "A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes," FED. R. CIV. P. 10(c), and may be considered by the Court on a motion to dismiss without converting the motion into one for summary judgment.  Abhe & Svoboda, Inc. v. Chao, 508 F.3d at 1059.  It is apparent that certain documents and other material attached to a pleading do not qualify as a "written instrument" and therefore do not fall within the meaning of the language in Rule 10(c).  5A WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 1327 (3d ed. 2004); see Perkins v. Silverstein, 939 F.2d 463, 467 (7th Cir. 1991) ("The newspaper articles, commentaries and editorial cartoons which Perkins attached to the complaint . . . are not the type of documentary evidence or 'written instrument[s]' which Fed. R. Civ. P. 10(c) intended to be incorporated into, and made a part of, the complaint."); Murphy v. Cadillac Rubber & Plastics, Inc., 946 F. Supp. 1108, 1115 (W.D.N.Y. 1996) ("A 'written instrument' is a document evidencing legal rights or duties or giving formal expression to a legal act or agreement, such as a deed, will, bond, lease, insurance policy or security agreement.") (citing BLACK'S LAW DICTIONARY 801, 1612 (6th ed. 1990)); 5A FEDERAL PRACTICE AND PROCEDURE § 1327 ("Of course, lengthy or numerous exhibits containing extraneous or evidentiary material should not be attached to the pleadings.") (citing cases).  The Court will consider only those materials attached by the plaintiffs as exhibits to their complaint that it determines fairly fall within the scope of Rule 10(c).

## III.  DISCUSSION

### A.  Disparate Treatment Based on Race under the FHA (Count I)[6]

#### 1.  "Dwellings" under the FHA

The Fair Housing Act prohibits discrimination in the sale and rental of properties

and also makes it unlawful to "otherwise make unavailable or deny[] a dwelling to any person

because of race, color, religion, sex, familial status, or national origin."  42 U.S.C. § 3604.  If La

Casa qualifies as a "dwelling" under this provision, then its closure would appear to "make [it]

unavailable" to its former inhabitants and "deny" them a dwelling there within the meaning of

the FHA.  Cf. 2922 Sherman Ave. Tenants' Ass'n v. District of Columbia, 444 F.3d 673, 685

(D.C. Cir. 2006) (holding that instructing tenants that their occupancy is prohibited and that they

must seek alternative housing qualifies as making a dwelling "unavailable" under the FHA);

Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dept. of Hous. & Urban Dev., 723 F. Supp.

---

In addition, the plaintiffs' proposed amended complaint purports to "incorporate[] by reference in their entirety . . . [p]laintiffs' evidence previously filed, and points and authorities and facts provided in Plaintiffs' Reply to Defendant's Opposition to injunctive and declaratory relief, filed December 6, 2010, and the evidence filed Dec. 26, 2010 in Plaintiffs' Motion for Reconsideration."  2d Am. Compl. at 8 n.3.  There is no basis in the Federal Rules for incorporating these materials into the plaintiffs' complaint.  Rule 10 provides only that a "*statement in a pleading* may be adopted by reference . . . in any other pleading or motion."  FED. R. CIV. P. 10(c) (emphasis added).  The plaintiffs' prior memoranda and attachments thereto are not statements in a pleading, see FED. R. CIV. P. 7(a) (listing documents that constitute pleadings) and may not be incorporated by reference into a complaint.  Finally, in assessing the sufficiency of this complaint, the Court will not consider factual allegations made by the plaintiffs exclusively in their briefing, as opposed to within the proposed complaint itself.  The plaintiffs have had ample opportunity to fashion a comprehensive complaint, and ample warnings about the consequences of failing to do so.

[6]      Unless otherwise noted, references to counts in the complaint are to the proposed second amended complaint [Dkt. No. 68-1], which is attached to the plaintiffs' motion to amend.

2d 14, 22-23 (D.D.C. 2010) ("[T]he D.C. Circuit has made clear that 'make unavailable' means not just preventing access to new housing by prospective buyers and renters but also the loss of housing to those who already occupy it.").

As a preliminary matter, the Court rejects — at least at this stage of the proceedings — the District's contention that La Casa was not a "dwelling" within the meaning of the FHA and that the plaintiffs' FHA claims must fail on that basis alone.[7]  The District maintains that "several" courts "have found that the FHA does not apply to low barrier homeless shelters because such shelters do not fall within the FHA's definition of a 'dwelling.'"  MTD at 22; see Opp. Am. at 7 n.6.  In support, the District cites only two decisions, one of which did not rule on the issue at all, but instead assumed without deciding that homeless shelters *do* qualify as dwellings under the Act, while expressing some doubt about that point.  See Johnson v. Dixon, 786 F. Supp. 1, 4 (D.D.C. 1991).  The other decision found that a particular homeless shelter did not qualify as a "dwelling" based on ten context-specific factors regarding the terms of residence at that shelter — information that was presented at summary judgment.  See Intermountain Fair Hous. Council v. Boise Rescue Mission Ministries, 717 F. Supp. 2d 1101, 1111 (D. Idaho 2010). Here, such detailed information about the terms of residence at La Casa shelter has not been provided.

The District cites the definition of a "low barrier shelter" under D.C. Code § 4-751.01(26) in support of its contention that such shelters constitute "transient" housing

---

[7]      The FHA defines a "dwelling" as "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families, and any vacant land which is offered for sale or lease for the construction or location thereon of any such building, structure, or portion thereof."  42 U.S.C. § 3602(b).  The statute does not define the term "residence," however.

similar to "hotels and bed and breakfasts," but the District fails to note that the provision it cites

defines low-barrier facilities as offering shelter "without imposition of . . . time limits." Id. This

definition undermines the District's argument that La Casa "was neither intended nor designed

for long term stay," MTD at 24, a claim that is further belied by the plaintiffs' declarations

attesting to their habitual and regular stay at La Casa.  See 2d Am. Compl., Exh. 1.; cf.

Intermountain Fair Hous. Council v. Boise Rescue Mission Ministries, 717 F. Supp. 2d at 1111

(relying in part on fact that residents of shelter in question "generally are allowed to stay for a

maximum of seventeen consecutive nights").  Furthermore, the District concedes that at least

three decisions have applied the FHA to homeless shelters, while maintaining that these

decisions "have not squarely addressed whether all homeless shelters constitute a 'dwelling'

under the FHA."  MTD at 23.

 Mindful that "the FHA should be broadly construed to effectuate its remedial

purpose," Nat'l Fair Hous. Alliance, Inc. v. Prudential Ins. Co. of Am., 208 F. Supp. 2d 46, 55

(D.D.C. 2002) (citing Trafficante v. Metropolitan Life Ins. Co., 409 U.S. 205, 211-12 (1972)),

and lacking evidence about La Casa of the type that was relied on in Intermountain Fair Housing

Council, the Court does not find the FHA categorically inapplicable based on its definition of the

word "dwelling."

## 2.  Sufficiency of the Plaintiffs' Allegations

 "[P]laintiffs alleging disparate treatment must establish . . . that the defendant

intentionally discriminated against them on the basis of race or ethnicity." 2922 Sherman Ave.

Tenants' Ass'n v. Dist. of Columbia, 444 F.3d at 682; see id. at 684 ("In disparate treatment

cases . . . we focus on the defendant's motivation, not the effects of its actions.").  In disparate

treatment claims under the FHA, this circuit has utilized the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973), for employment discrimination cases. 2922 Sherman Ave. Tenants' Ass'n v. Dist. of Columbia, 444 F.3d at 682. That framework applies "where direct evidence of discriminatory intent is not available," Hall v. Giant Food, Inc., 175 F.3d 1074, 1077 (D.C. Cir. 1999), and plaintiffs may proceed by "present[ing] sufficient evidence to permit an inference of discrimination," which the defendant must rebut by articulating "a legitimate, nondiscriminatory reason for its actions," which in turn may be rebutted "by showing that the defendant's proffered reason was pretext for discrimination." Id. (citing McDonnell Douglas Corp. v. Green, 411 U.S. at 802-04). The plaintiff "may meet her burden of proof by either direct or circumstantial evidence." Dunaway v. Int'l Broth. of Teamsters, 310 F.3d 758, 763 (D.C. Cir. 2002) (citing U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 714 n.3 (1983)).

That having been said, under the burden-shifting framework the question of whether a prima facie case has been established "is almost always irrelevant. At the motion to dismiss stage, the district court cannot throw out a complaint even if the plaintiff did not plead the elements of a prima facie case." Brady v. Office of Sergeant at Arms, 520 F.3d 490, 493 (D.C. Cir. 2008) (citing Swierkiewicz v. Sorema N.A., 534 U.S. 506, 510-11 (2002)). Rather, "the ordinary rules for assessing the sufficiency of a complaint apply." Swierkiewicz v. Sorema N. A., 534 U.S. at 511. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," meaning that "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." In re Interbank Funding Corp. Sec.

Litig., 629 F.3d at 218 (quoting Ashcroft v. Iqbal, 556 U.S. at 678).  The Supreme Court has

explained that "a court considering a motion to dismiss can choose to begin by identifying

pleadings that, because they are no more than conclusions, are not entitled to the assumption of

truth.  While legal conclusions can provide the framework of a complaint, they must be

supported by factual allegations."  Ashcroft v. Iqbal, 556 U.S. at 679.

            Here, the plaintiffs allege that the District intentionally discriminated against them

based on their race.  2d Am. Compl. ¶ 85.  In support of this claim, they offer only the bare

assertion that the District's PSH program "has been used as an excuse for closing the shelters in

the predominantly white parts of the city."  Id. ¶ 69.  The plaintiffs describe in detail the

hardships suffered by former residents of La Casa, and they make a number of allegations

regarding the general state of homelessness and poverty in Washington, D.C., and the inadequate

implementation of the PSH program.  Id. ¶¶ 54-55, 61, 63-67, 71-79.  Entirely missing are any

factual allegations that would support their stark accusation of intentional discrimination based

on race.  A complaint does not suffice "if it tenders 'naked assertion[s]' devoid of 'further factual

enhancement.'"  Ashcroft v. Iqbal, 556 U.S. at 678 (quoting Bell Atl. Corp. v. Twombly, 550

U.S. at 557).  The plaintiffs have made no allegations that, accepted as true, could serve as

"direct evidence of discriminatory intent," Hall v. Giant Food, Inc., 175 F.3d at 1077, nor that

could "permit an inference of discrimination."  Id.  Without any supporting factual allegations,

the plaintiffs' assertions reduce to mere legal conclusions that are not entitled to the assumption

of truth.  See Bell Atl. Corp. v. Twombly, 550 U.S. at 556-57 (holding that "bare assertion of

conspiracy" and "conclusory allegation of agreement at some unidentified point does not supply

facts adequate to show illegality"); Ashcroft v. Iqbal, 556 U.S. at 680 (stating that in Twombly,

"the plaintiffs' assertion of an unlawful agreement was a 'legal conclusion' and, as such, was not entitled to the assumption of truth").  The scant facts alleged in the plaintiffs' proposed second amended complaint do not "plausibly give rise to an entitlement to relief."  Id.

The plaintiffs' proposed new complaint (unlike their earlier efforts) includes the race of each plaintiff, all of whom are African American or Hispanic, with the exception of one individual who is described as Pakastani.  2d Am. Compl. ¶¶ 2-43.  Aside from this, the only information of any relevance that the plaintiffs propose adding is to include "more specific allegations of the racial composition areas in which La Casa and other recently closed shelters were located as compared with the racial composition of the areas in which the remaining shelters and PSH placements that have been disclosed are located."  Mot. Am. at 2; see 2d Am. Compl., Exh. 4.  The Court already has explained why such demographic information, without more, fails to supply either direct evidence of discriminatory intent or an inference of discrimination.  Opinion at 8-9 (Dec. 17, 2010).  The plaintiffs therefore are merely proposing to add "more specific allegations" about a matter that cannot alone prove their claim.  The facts alleged in the proposed second amended complaint about the racial composition of various census tracks within the city do not satisfy "[t]he need at the pleading stage for allegations plausibly suggesting (not merely consistent with)" intentional racial discrimination on the part of the District.  Bell Atl. Corp. v. Twombly, 550 U.S. at 557.  Because this information does not provide "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]," therefore "without some further factual enhancement it stops short of the line between possibility and plausibility of 'entitle[ment] to relief.'"  Id. (quoting FED. R. CIV. P. 8(a)(2)).

12

The plaintiffs seek to add other new information in support of their claim, contained in exhibits to the proposed complaint, but this information patently does not possess the significance they attribute to it.  The plaintiffs, for instance, provide a Mayor's Report on Supportive Housing Placements and Emergency Shelter, purportedly from September 2010, which is offered to show "the census tracks of relocations in Permanent Supportive Housing of Former La Casa Shelter inhabitants."  2d. Am. Compl., Exh. 5.  The geographic disbursement within the city of people who formerly resided at La Casa could indeed help demonstrate that "homeless individuals, predominantly people of color, have been forced to move in significant numbers from Wards 1 or 2 'to wards which are highest in minority population' because of the closures of La Casa."  Opinion at 9 (Dec. 17, 2010) (quoting plaintiffs' reply memorandum).  In conjunction with other factual allegations, perhaps such information might support an inference of discriminatory intent behind the policies that led to this disbursal.  But the report offered by the plaintiffs is actually from September 2008, predating the closure of La Casa by two years.  Therefore it cannot shed light on the disbursement within the city of individuals who formerly resided at La Casa through the PSH program.  Similarly, the plaintiffs cite a press release from the Downtown DC Business Improvement District describing the efforts of its Downtown Homeless Outreach Team, which according to the plaintiffs "report[s] a decrease in the homeless on the streets of downtown DC at night from 93 in 2009 to 73 in 2010."  See 2d Am. Compl., Exh. 6.  This report also covers the period before the closure of La Casa (and attributes the decrease to the outreach team's engagement efforts).  Id.  The point here is not that the plaintiffs have failed to meet an evidentiary burden, but rather that, in lieu of the needed factual allegations

supporting the plausibility of their claim for intentional racial discrimination, they have supplied data contributing nothing to support that claim's plausibility.

None of the other information that the plaintiffs seek to add to their complaint has any bearing on the District's allegedly discriminatory intent. <u>See</u> Mot. Am. at 2, 5-7; 2d Am. Compl., Exhs. 1-16. The Court finds that the plaintiffs' claim for disparate treatment under the FHA based on race lacks the plausibility required to survive a motion to dismiss.

### B. Disparate Treatment Based on Disability under the FHA (Count II)

The plaintiffs allege that in closing La Casa the District intentionally discriminated against them because of their disabilities. The declarations submitted by eight proposed plaintiffs indicate that they suffer from health problems that may or may not qualify as a "handicap" within the meaning of the FHA. <u>See</u> 2d Am. Compl., Exh. 1.[8]

At the outset, it is not entirely clear to the Court how the plaintiffs' claim is cognizable within the language of the FHA. It is unlawful under the Act "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of . . . a person residing in or intending to reside in that dwelling after it is . . . made available." 42 U.S.C. § 3604(f)(1)(B). The former residents of La Casa were neither buyers nor renters of that property, which the parties agree was owned by the District until it was sold to a private developer. 2d Am. Compl. ¶¶ 46, 47. The FHA also makes it unlawful "[t]o

---

[8]     "'Handicap' means, with respect to a person . . . a physical or mental impairment which substantially limits one or more of such person's major life activities, a record of having such an impairment, or being regarded as having such an impairment." 42 U.S.C. § 3602(h). The District contends that none of the plaintiffs have sufficiently alleged their possession of a "handicap" within the meaning of the FHA. That contention is addressed below, <u>infra</u> at 25-26, in the context of the plaintiffs' claims under the ADA, which employs a nearly identical definition for "disability."

discriminate against any person . . . in the provision of services or facilities in connection with [a] dwelling, because of a handicap of . . . that person."  42 U.S.C. § 3604(f)(2)(A).  Assuming again that La Casa qualifies as a "dwelling" under the FHA, see supra at 7-9, if the District closed La Casa in order to discriminate against its residents on the basis of their disabilities, then that act perhaps could qualify as discriminating against La Casa's disabled residents "in the provision of services or facilities in connection with" their former dwelling because of their handicap.  While the Court will assume that such a reading is tenable, it notes that the language of the provision as a whole appears to evince an exclusive concern with the sale and rental of properties and the provision of services to renters.[9]

Even if the plaintiffs' claim for intentional disability discrimination is cognizable within the FHA, however, the claim suffers from the same flaw as their claim for intentional race discrimination under the Act: the plaintiffs have not alleged "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. at 678 (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. at 570).  Indeed, the plaintiffs' claim of intentional disability discrimination is even more infirm than their claim of intentional race discrimination.  Whereas the plaintiffs make at least some effort to cite information from which

---

[9]     The statute provides that "it shall be unlawful:

(2) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of —
    (A) that person; or
    (B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or
    (C) any person associated with that person.

42 U.S.C. § 3604(f).

one might infer that the closure of La Casa was motivated by a desire to reduce the minority population of Northwest Washington, see supra at 12-13, the plaintiffs have proffered absolutely no allegations supporting a plausible inference that the District closed La Casa because of the disabilities of its residents.  This "naked assertion," devoid of "further factual enhancement," is insufficient and cannot survive a motion to dismiss.  Ashcroft v. Iqbal, 556 U.S. at 678.

### C.  Disparate Impact Based on Race under the FHA (Count III)

Although the D.C. Circuit has not yet decided whether disparate impact claims are available under the Fair Housing Act, every other circuit has concluded that they are.  Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dept. of Hous. & Urban Dev., 639 F.3d 1078, 1085 (D.C. Cir. 2011) (citing 2922 Sherman Avenue Tenants' Ass'n v. District of Columbia, 444 F.3d at 679).  Because this circuit has yet to resolve the question, it also has not decided which of the two "leading tests for applying disparate impact" under the FHA should be used to evaluate such claims.  Id. (citing "the four-factor balancing test of the Seventh Circuit, Metropolitan Housing Development Corp. v. Village of Arlington Heights, 558 F.2d 1283, 1290 (7th Cir. 1977), [and] the burden-shifting test of the Second Circuit, Huntington Branch, NAACP v. Town of Huntington, 844 F.2d 926, 935-36 (2nd Cir. 1988)").  Our circuit has noted, however, that in some cases "the success of plaintiffs' claim doesn't turn on the details of the legal test" because "either approach requires proof of disproportionate impact, measured in some plausible way."  Id. (citing 2922 Sherman Avenue Tenants' Ass'n v. Dist. of Columbia, 444 F.3d at 679-80); see Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mount Holly, 658 F.3d 375, 382 (3d Cir. 2011) ("'[N]o single test controls in measuring disparate impact,' but the Residents must offer

proof of disproportionate impact, measured in a plausible way.") (quoting <u>Hallmark Developers, Inc. v. Fulton Cnty.</u>, 466 F.3d 1276, 1286 (11th Cir. 2006)).

1.  Disproportionate Effect

"[T]o prove a disparate impact claim . . . a plaintiff must first demonstrate that the challenged policy or practice has a disproportionate effect on a protected class."  <u>2922 Sherman Avenue Tenants' Ass'n v. Dist. of Columbia</u>, 444 F.3d at 679.  The parties express different views on the correct framework for that inquiry in this case.  The plaintiffs appear to allege that simply because the homeless population that frequented La Casa was predominantly African American and Hispanic, the closure of that shelter had a disproportionate effect on those two racial groups.  <u>See</u> 2d Am. Compl. ¶¶ 95-97.  The District suggests that the plaintiffs instead must show "that the closing of La Casa disproportionately affected minorities . . . either vis-à-vis the population at the La Casa shelter or vis-à-vis the homeless population within the District as a whole."  Opp. Am. at 11; <u>see</u> MTD at 19 (stating that plaintiffs must articulate supporting facts suggesting that members of racial minorities "frequent[ed] La Casa at a higher rate than other shelters in the city").  In other words, the District contends that a finding of disparate impact requires showing that the closure of La Casa (1) affected its minority residents more than its Caucasian residents, or (2) disproportionately affected minorities within the overall homeless population as compared with the Caucasians in that population.

Other circuits have held that where the population relying on or in need of housing assistance is disproportionately composed of racial minorities, a decision adversely affecting the availability of that assistance has a disproportionate impact on a protected class, subjecting the decision to disparate impact analysis.  "Where a plaintiff demonstrates that a

17

protected group depends on low-income housing to a greater extent than the non-protected

population . . . courts have found it reasonable to infer that the protected group will experience a

disproportionate adverse effect from a policy or decision that reduces low-income housing."

Gallagher v. Magner, 619 F.3d 823, 835 (8th Cir. 2010); see id. (because racial minorities in city

are disproportionately in need of affordable housing, housing code enforcement that decreases

availability of such housing has disproportionate adverse effect on racial minorities); Keith v.

Volpe, 858 F.2d 467, 484 (9th Cir. 1988) (because two-thirds of population that would benefit

from state-assisted housing are minority, failure to build projects has twice the adverse impact on

minorities as it had on whites); Huntington Branch, NAACP v. Town of Huntington, 844 F.2d at

929 (because higher percentage of families in subsidized housing and on waiting list are

minority, restricting location of housing projects has disproportionate effect); Metropolitan

Housing Development Corp. v. Village of Arlington Heights, 558 F.2d at 1288 (because greater

number of blacks than whites in metropolitan area qualify for subsidized housing, refusal to

permit construction of new subsidized units has disproportionate effect); Resident Advisory Bd.

v. Rizzo, 564 F.2d 126, 142 (3d Cir. 1977) (because waiting list for public housing is composed

primarily of racial minorities, cancellation of housing project has disproportionate effect).

Our circuit appears to have at least hinted an approval of this approach.  In 2922

Sherman Avenue Tenants' Ass'n v. Dist. of Columbia, 444 F.3d at 681, the court cited the

Second Circuit's Huntington Branch decision as an example of a case in which the plaintiffs

demonstrated disproportionate effect.  See id. (stating that the Huntington plaintiffs "presented

evidence that although only 5 percent of the town's population was minority, each of the town's

three housing projects had between 30 and 95 percent minority residents") (citing Huntington

18

Branch, NAACP v. Town of Huntington, 844 F.2d at 929).  The court in 2922 Sherman Avenue rejected the disparate impact claim before it because the plaintiffs did not prove at trial, as they had alleged, that certain buildings targeted for closure by the District were disproportionately Hispanic.  Id.[10]

In light of the available case law and the absence of precedent from our circuit, the Court is not convinced that the plaintiffs can succeed, as the District contends, only by showing that white residents of La Casa were more affected by its closure than were minority residents, or that La Casa housed a higher percentage of minorities than other shelters.  If a disproportionately high percentage of the homeless population in Washington, D.C., is minority, then action by the District adversely affecting that population could state a claim for disparate impact.  Cf. Metropolitan Housing Development Corp. v. Village of Arlington Heights, 558 F.2d at 1288 ("Because a greater number of black people than white people in the Chicago metropolitan area satisfy the income requirements for federally subsidized housing, the Village's refusal to permit MHDC to construct the project had a greater impact on black people than on white people.").[11]

---

[10]     Note,  however, the court's statement that because it reached this conclusion, it "need not consider the District's argument that the tenants' disparate impact claim fails for lack of 'evidence of a relevant comparison group — i.e., persons unaffected by the policy who were not in the protected group and who were similarly [situated].'"  2922 Sherman Ave. Tenants' Ass'n v. Dist. of Columbia, 444 F.3d at 681 (quoting the District's brief).

[11]     The Court acknowledges that the cases discussed above involve government action affecting all persons within a community who need low-income housing, and that these cases do not necessarily apply with equal force to government action that affects a much smaller portion of the community.  In the former scenario, because of the relatively large percentage of people affected by the government's action (out of the entire community), any racial imbalance in the effect of that action "makes housing options significantly more restrictive for members of a protected group than for persons outside that group."  Hallmark Developers, Inc. v. Fulton County, Ga., 466 F.3d at 1286.  The smaller the affected population, however, the less readily it can be said that a racially disproportionate effect within that population affects housing options for the racial group as a whole.

2.  "Segregative Effect"

In addition, other circuits have held that demonstrating a disproportionate effect on a protected class is only one way to make out a disparate impact housing discrimination claim. These circuits hold that there are "two types of discriminatory effects which a facially neutral housing decision can have." Graoch Associates # 33, L.P. v. Louisville/Jefferson County Metro Human Relations Comm'n, 508 F.3d 366, 378 (6th Cir. 2007).  The first, just discussed, "occurs when [a] decision has a greater adverse impact on one racial group than on another." Id.  "The second is the effect which the decision has on the community involved; if it perpetuates segregation and thereby prevents interracial association it will be considered invidious under the Fair Housing Act independently of the extent to which it produces a disparate effect on different racial groups." Id. (quoting Arthur v. City of Toledo, Ohio, 782 F.2d 565, 575 (6th Cir. 1986)); see Hallmark Developers, Inc. v. Fulton County, Ga., 466 F.3d at 1286 ("A plaintiff can demonstrate a discriminatory effect in two ways: it can demonstrate that the decision has a segregative effect or that it makes housing options significantly more restrictive for members of a protected group than for persons outside that group.") (internal quotation omitted); Metropolitan Housing Development Corp. v. Village of Arlington Heights, 558 F.2d at 1290 (same); Huntington Branch, NAACP v. Town of Huntington, 844 F.2d at 937 ("The discriminatory effect of a rule arises in two contexts: adverse impact on a particular minority group and harm to the community generally by the perpetuation of segregation. . . . [T]he lower court concentrated on the harm to blacks as a group, [but] failed to consider the segregative effect of maintaining a zoning ordinance that restricts private multi-family housing to an area with a high minority concentration.").

Viewing the plaintiffs' allegations in the context of this second theory, the plaintiffs allege that the PSH program has had the effect of "closing the shelters in the predominantly white parts of the city," 2d Am. Compl. ¶ 69, and forcing the homeless "to seek shelter in the far flung parts of the city in Anacostia, and the desolate warehouse districts of Ward 5." Id. ¶ 54. Specifically, they say that by closing La Casa (and other low-barrier shelters in the northwest quadrant of the city), while leaving such shelters open in the northeast and southeast quadrants and focusing its PSH placements there, the District is concentrating the predominantly minority homeless population in the areas of the city with the highest minority populations and removing them from the areas with a higher Caucasian population. Through an exhibit attached to their complaint, the plaintiffs seek to demonstrate that former La Casa residents have been displaced from census tracks characterized by a diverse (and significantly Caucasian) population to census tracks where the remaining low-barrier shelters are located that are between 94% and 99% Black. 2d Am. Compl., Exh. 4. The plaintiffs also seek to show that homeless individuals who have been placed in permanent supportive housing have been assigned to census tracks that range from 94% to 98% Black. Id.[12] These are allegations of a racially segregative effect, which courts have recognized as a form of disparate impact under the FHA.

Whether or not the plaintiffs ultimately can succeed in proving their disparate impact claim, on either a disproportionate effect or segregative effect theory, the claim can survive a motion to dismiss. To be sure, in order to prevail the plaintiffs likely will need to provide statistical analyses supporting their allegation that the District's conduct has had a

---

[12]   See also 2d Am. Compl. ¶ 72 ("Former residents are relegated to now seek shelter . . . in the most distant and poorest parts of the city."); id. ¶ 77 ("Most PSH placements have occurred in the poorest and most violent parts of town[.]").

racially disproportionate or segregative effect.  See Cinnamon Hills Youth Crisis Ctr., Inc. v. Saint George City, 685 F.3d 917, 922 (10th Cir. 2012); Hallmark Developers, Inc. v. Fulton County, Ga., 466 F.3d 1276, 1286 (11th Cir. 2006); Tsombanidis v. W. Haven Fire Dept., 352 F.3d 565, 575 (2d Cir. 2003); Graoch Associates # 33, L.P. v. Louisville/Jefferson County Metro Human Relations Comm'n, 508 F.3d at 378.  With respect to any segregative effect theory, proving the displacement of homeless persons will not suffice; rather, the plaintiffs will need to demonstrate that the closure of La Casa had a measurable impact on the racial composition of the city's wards or neighborhoods.  As skeptical as the Court is that the plaintiffs' claim has any chance of success, that is a matter for summary judgment.  See Bell Atl. Corp. v. Twombly, 550 U.S. at 556 (stating that a complaint alleging sufficient facts may proceed even if it strikes a judge that "actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely'") (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

The Court therefore concludes that the plaintiffs' claim for disparate impact based on race under the FHA can survive a motion to dismiss.

### D.  Disparate Impact Based on Disability under the FHA (Count IV)

Courts that recognize the availability of disparate impact claims under the FHA have permitted such claims with respect to disability discrimination as well as racial discrimination.  E.g., Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown, 294 F.3d 35, 48 (2d Cir. 2002); Keys Youth Services, Inc. v. City of Olathe, KS, 248 F.3d 1267, 1272 (10th Cir. 2001); Smith & Lee Assocs., Inc. v. City of Taylor, 102 F.3d 781, 790 (6th Cir. 1996). The plaintiffs in this case, however, have alleged no facts that would support a disparate impact disability claim, nor have they articulated any viable theory by which such a claim can succeed.

The proposed second amended complaint states in a conclusory fashion that "[p]laintiffs are a protected class under the FHA, mentally disabled, physically disabled and suffering from substance abuse."  2d Am. Compl. ¶¶ 89, 101; see also id. ¶ 54 (listing disabilities allegedly suffered by "[n]umerous residents" of La Casa, but making no allegations about the plaintiffs).  The complaint provides no detailed allegations about any disabilities suffered by any of the plaintiffs; the closest it comes to doing so is by providing declarations in which some plaintiffs identify health conditions from which they suffer but provide no further information. The complaint makes no allegations about what percentage of La Casa residents were disabled, nor about the percentage among the city's homeless population at large.  It simply states that "[f]ormer residents of La Casa Shelter include those with compromised physical and mental capacities[.]"  2d Am. Compl. ¶ 75.

The mere fact that many residents of La Casa may have possessed a disability — which is all that the plaintiffs have alleged — does not mean that the closure of the shelter had a disproportionate effect on the disabled under the FHA.  See HDC, LLC v. City of Ann Arbor, 675 F.3d 608, 613 (6th Cir. 2012) ("While the developers allegedly sought to build housing for handicapped individuals, the developers' project also planned to house the chronic homeless and other low-income individuals.  Given the breadth of the type of individuals that the developers' proposed project would have housed, the mere fact that Ann Arbor terminated the contract . . . would not necessarily have caused handicapped individuals to suffer disproportionately more than other individuals[.]"); Tsombanidis v. W. Haven Fire Dept., 352 F.3d at 576 ("The district court merely required plaintiffs to show they could not live in the house they desired because of the [zoning] code and that plaintiffs needed this type of housing due to their handicap.  The

court's analysis would appear to apply to *any* facially neutral housing policy that prevents a handicapped person from living in a particular house.  Such a standard is not sufficient for disparate impact purposes.").

The plaintiffs' allegations, accepted as true, thus cannot support a finding that the closure of La Casa had a disproportionate effect on the disabled.  None of the plaintiffs' allegations support a "segregative effect" theory with respect to disability, as opposed to race, see supra at 20-21, nor does such a theory appear to have been adopted by other courts with respect to disability or make sense in that context.  The plaintiffs' claim for disparate impact discrimination under the FHA based on disability, therefore, does not state a claim upon which relief can be granted and cannot survive a motion to dismiss.

### E.  Disparate Treatment under the ADA (Count V)

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  The term "public entity" includes state and local governments and any department or agency thereof, 42 U.S.C. § 12131(1), and the term "disability" means "a physical or mental impairment that substantially limits one or more major life activities of such individual," "a record of such an impairment," or "being regarded as having such an impairment."  42 U.S.C. § 12102(1); see Singh v. George Washington Univ. Sch. of Med. & Health Sciences, 508 F.3d 1097, 1099 (D.C. Cir. 2007).[13]  A major life activity within the

---

[13]     The term "qualified individual with a disability" means "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary

meaning of the statute is one that is "central importance to most people's daily lives," and the impairment "must also be permanent or long term."  Toyota Motor Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184, 198 (2002).  In order to prove that a public program violates Title II, a plaintiff must show that (1) he or she is a qualified individual with a disability; (2) he or she was either excluded from participation in or denied the benefits of a public entity's services, programs or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of his or her disability.  Equal Rights Ctr. v. Dist. of Columbia, 741 F. Supp. 2d 273, 283 (D.D.C. 2010).

      The District contends that the plaintiffs' ADA claims must fail at the outset because the plaintiffs "have made no factual allegations that would enable the Court to find that a single plaintiff is a member of a protected class on the basis of his disability." Opp. Am. at 3. As described above, supra at 23, the plaintiffs have provided only minimal information about their alleged disabilities, in the form of declarations from several plaintiffs that name a health condition without providing more detail about the nature or severity of that condition. Highlighting this paucity of information, the District argues that the plaintiffs "fail to provide any allegations or evidence demonstrating that they are substantially limited by their alleged disabilities." Op. Am. at 3.  These "generalized statements," according to the District, "are insufficient to identify even [these] plaintiffs as disabled" because the statements do not "provide any information from which one can conclude that their physical or psychological complaints

---

aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  42 U.S.C. §§ 12131(2).

substantially limit one or more major life activities as the [ADA] require[s]." Id. at 3, 8.[14]

In the District's view, to survive a motion to dismiss a plaintiff cannot merely claim to suffer from a particular impairment, but instead must specifically plead that the impairment substantially limits one or more major life activities of the plaintiff, or allege facts supporting such a finding.  The District cites no authority imposing such a requirement at the motion to dismiss stage.  As it turns out, authority is mixed on that question, see E.E.O.C. v. J.H. Routh Packing Co., 246 F.3d 850, 852 (6th Cir. 2001), and the contrary view appears to have the better of the argument, having garnered support from several federal circuits.  See Fowler v. UPMC Shadyside, 578 F.3d 203, 213-14 (3d Cir. 2009); E.E.O.C. v. J.H. Routh Packing Co., 246 F.3d at 854; Menkowitz v. Pottstown Memorial Medical Center, 154 F.3d 113, 117-18 n.2 (3d Cir. 1998); E.E.O.C. v. Browning Ferris, Inc., 225 F.3d 653 (4th Cir. 2000) (unpublished); Duda v. Bd. of Educ. of Franklin Park Pub. Sch. Dist. No. 84, 133 F.3d 1054, 1059 (7th Cir. 1998); see also Rohm v. Homer, 367 F. Supp. 2d 1278, 1283 (N.D. Cal. 2005); E.E.O.C. v. Nw. Airlines, Inc., 216 F. Supp. 2d 935, 938-39 (D. Minn. 2002); but see Puckett v. Park Place Entm't Corp., 332 F. Supp. 2d 1349, 1355 (D. Nev. 2004); Chille v. United Airlines, 192 F. Supp. 2d 27, 29-30 (W.D.N.Y. 2001); Saunders v. Baltimore County, Md., 163 F. Supp. 2d 564, 567-69 (D. Md. 2001).  This Court is persuaded by the decisions holding that specific allegations about the limitation of a major life activity caused by the plaintiff's impairment are not required to survive a motion to dismiss.[15]

---

[14]    The District makes the same argument with respect to the plaintiffs' FHA and DCHRA disability claims.  Opp. Am. at 3.

[15]    While some of these decisions expressly rely on pre-Iqbal pleading standards, the Third Circuit has stated that its conclusion is valid "even after Twombly and Iqbal."  Fowler v. UPMC Shadyside, 578 F.3d at 214.

This conclusion does not help the plaintiffs, however, because the Court concludes that their claim fails for a different reason: it is indistinguishable from the plaintiffs' claim for disparate treatment based on disability under the FHA, which the Court already has concluded fails to state a claim upon which relief can be granted.  See supra at 14-16.  For the same reasons, the plaintiffs' disparate treatment ADA claim cannot survive a motion to dismiss.

### F.  Disparate Impact under the ADA (Count VI)

Disparate impact claims are cognizable under the ADA.  Raytheon Co. v. Hernandez, 540 U.S. 44, 53 (2003).  Where such claims involve housing, courts have applied the same analysis used for disparate impact claims based on disability under the FHA.  E.g., Tsombanidis v. W. Haven Fire Dept., 352 F.3d at 574-78.  In this case, the plaintiffs' disparate impact ADA claim suffers from the same flaw as their disparate impact FHA disability claim — namely the absence of any allegations in the complaint plausibly supporting a claim for disparate impact discrimination on the basis of disability.  See supra at 22-24.  This claim therefore cannot survive a motion to dismiss.

### G.  Place of Residence Discrimination under the DCHRA (Counts VII and VIII)

The plaintiffs bring claims for disparate treatment and disparate impact based on place of residence under the DCHRA.  See D.C. Code § 2-1401.01 et seq.  Recovery is available under the DCHRA on both disparate treatment and disparate impact theories.  2922 Sherman Avenue Tenants' Ass'n v. Dist. of Columbia, 444 F.3d at 685 (citing Gay Rights Coal. v. Georgetown Univ., 536 A.2d 1, 29 (D.C. 1987)); see Am. Fed'n of State, County, Mun. Employees Local 2401 v. Dist. of Columbia, 796 F. Supp. 2d 136, 144 (D.D.C. 2011).  The

plaintiffs identify themselves as residents of "Northwest Washington, D.C." and allege that the

District "intentionally discriminate[d] against [them] by closing La Casa Shelter," and that

"[o]ther similarly situated shelters in remote areas of Wards 7 and 8 were treated differently" by

the District.  2d Am. Compl. ¶¶ 122-24.  They also allege that the closure of La Casa "had a

disproportionate impact on the residents of Northwest Washington, D.C."  Id. ¶ 129.

Although the plaintiffs do not identify the provision on which their claims are

based, it appears that their claims are cognizable, if at all, within either of two provisions.  Under

D.C. Code § 2-1402.31(a)(1), it is "an unlawful discriminatory practice" to "deny, directly or

indirectly, any person the full and equal enjoyment of the goods, services, facilities, privileges,

advantages, and accommodations of any place of public accommodations" if the denial is made

"wholly or partially for a discriminatory reason based on the actual or perceived . . . place of

residence . . . of any individual."[16]  The wholesale closure of a place of accommodation, which

prevents *all* individuals from utilizing its benefits, does not appear to be an act that deprives any

individual person of "the full and equal enjoyment" of that place.  The statute's language clearly

implies that a violation occurs where some individuals receive the benefit of a place of

accommodation while others do not (or where some individuals receive greater benefits than

---

[16]     The term "place of public accommodation" is defined "broadly" under the
DCHRA, Blodgett v. Univ. Club, 930 A.2d 210, 218 (D.C. 2007), and would seem to include
homeless shelters.  See D.C. Code § 2-1401.02(24) ("'Places of public accommodation' means,"
inter alia, "all places including in the meaning of such terms as inns, taverns, road houses, hotels,
motels, whether conducted for the entertainment of transient guests or for the accommodation of
those seeking health, recreation or rest[,] establishments dealing with goods or services of any
kind[, and] public halls[.]"); Dean v. Dist. of Columbia, 653 A.2d 307, 319 (D.C. 1995)
(assuming without deciding that D.C. Marriage License Bureau is a place of public
accommodation while noting amicus curiae argument by District Human Rights Commissioners
that "all District of Columbia agencies are places of public accommodation, within the meaning
of the Human Rights Act, because they provide goods and services to District residents").

others).  Unsurprisingly, in light of the text of Section 2-1402.31(a)(1), cases dealing with that provision have involved defendants who denied the benefit of a place of accommodation to certain individuals — during the scope of continuing operations — while providing that same benefit to others.  E.g., Mitchell v. DCX, Inc., 274 F. Supp. 2d 33, 49 (D.D.C. 2003) (finding liability where taxi company was "significantly less likely to pick up a person requesting services from Anacostia than it [was] to pick up a person requesting service from another part of the city"); Sumes v. Andres, 938 F. Supp. 9, 12-13 (D.D.C. 1996); Boy Scouts of Am. v. District of Columbia Comm'n on Human Rights, 809 A.2d 1192, 1195-96 (D.C. 2002).

Separately, D.C. Code § 2-1402.73 states that "[e]xcept as otherwise provided for by District law or when otherwise lawfully and reasonably permitted," it is "an unlawful discriminatory practice for a District government agency or office to limit or refuse to provide any facility, service, program, or benefit to any individual on the basis of an individual's actual or perceived . . . place of residence."  There is a dearth of case law respecting this provision, which became effective in 2002, and the Court has not located any decisions applying it.  See George Washington Univ. v. Dist. of Columbia Bd. of Adjustment, 831 A.2d 921, 941 n.16 (D.C. 2003) (briefly discussing Section 2-1402.73).  Nevertheless, the Court believes that it does not speak to the allegations made by the plaintiffs.

The plaintiffs allege that the District of Columbia discriminated against them by closing La Casa while not closing low-barrier shelters in Wards 7 and 8.  2d Am. Compl. ¶¶ 123-24.  But it cannot be that Section 2-1402.73 is violated simply because the District closes a public assistance facility in one part of the city while failing to close similar facilities in a different part of the city.  Under that reasoning, virtually any decision by the District limiting or

restricting services of any kind in one quadrant, ward, or neighborhood could be challenged as

discriminatory under the DCHRA.  The same logic would seemingly allow individuals to sue

over a failure to construct facilities or provide services in one part of the city where such

facilities or services are available elsewhere.  This broad interpretation, which would subject an

unimaginable number of routine policy decisions to litigation, cannot credibly be derived from a

provision that bars discrimination "on the basis of" place of residence or eighteen other protected

traits.  As with Section 2-1401.31(a)(1), the language of Section 2-1402.73 signals a focus on the

selective denial of benefits to certain persons, based on their place of residence, while those

benefits remain available to other persons.  See D.C. Code § 2-1402.73 (making it unlawfully

discriminatory to deny services "*to any individual* on the basis of *an individual*'s actual or

perceived . . . place of residence") (emphasis added).  The conduct challenged here by the

plaintiffs simply is not encompassed within that definition.[17]

      In sum, the Court concludes that the plaintiffs have not stated viable claims for

place of residence discrimination under the DCHRA; those claims accordingly cannot survive a

motion to dismiss.

### H.  Disability Discrimination under the DCHRA (Counts IX and X)

      The plaintiffs also bring claims for disability discrimination under the DCHRA,

alleging both disparate treatment and disparate impact.  The definition of "disability" under the

DCHRA is virtually identical to that under the ADA and to the definition of "handicap" under

---

[17]    A third conceivable vehicle for the plaintiffs' claims is D.C. Code § 2-1401.21(a),
which prohibits "place of residence" discrimination with respect to housing and commercial
space — but every subdivision under this section addresses real estate transactions or actions
affecting tenants or lessees; none is applicable to the closure of a homeless shelter.

the FHA.  See D.C. Code § 2-1401.02(5A).  "District of Columbia courts interpreting the DCHRA 'have generally looked [for guidance] to cases from the federal courts' arising under federal civil rights statutes."  Whitbeck v. Vital Signs, Inc., 116 F.3d 588, 591 (D.C. Cir. 1997) (quoting Benefits Communication Corp. v. Klieforth, 642 A.2d 1299, 1301-02 (D.C. 1994)). "Therefore, the D.C. law is applied in the same manner as the parallel federal antidiscrimination provisions."  Paralyzed Veterans of Am. v. Ellerbe Becket Architects & Engineers, P.C., 950 F. Supp. 393, 405 (D.D.C. 1996) (citing Benefits Communication Corp. v. Klieforth, 642 A.2d at 1301-02); see Chang v. Inst. for Pub.-Private Partnerships, Inc., 846 A.2d 318, 324 (D.C. 2004) ("We have considered decisions construing the ADA as persuasive in our decisions construing comparable sections of [the] DCHRA.") (quotation omitted).

Presumably, the plaintiffs base their claims on D.C. Code § 2-1402.31(a)(1), which prohibits discrimination in public accommodations based on disability, or on § 2-1402.73, which prohibits District agencies from refusing to provide facilities, benefits, or services on the basis of disability.  Because the language contained in these two provisions is different from the provisions of the ADA and FHA barring disability discrimination, the DCHRA may not be entirely parallel to a federal counterpart in this respect.  Yet the same problems that doom the plaintiffs' federal disability claims, see supra at 15-16, 22-24, 27, apply with equal force to any disability claims the plaintiffs might bring under the DCHRA.  The only potentially distinguishing feature of the plaintiffs' DCHRA claims is that under each count the plaintiffs aver, among other things, that the District "refus[ed] to accommodate their needs and requests for adequate shelter" as well as "for accessible mental health and health care services, adequate nutrition, and employment opportunity availability."  2d Am. Compl. ¶¶ 135, 143.

Notwithstanding the plaintiffs' use of the phrase "refusal to accommodate" in these two paragraphs, nothing in their complaint alleges a viable claim for failure to provide reasonable accommodation; rather, the plaintiffs appear to be simply characterizing the closure of La Casa and the resulting unavailability of shelter as a failure to accommodate.  That contention makes little sense.

The Court concludes that the plaintiffs' allegations of disability discrimination under the DCHRA do not state a claim upon which relief can be granted, and that these claims cannot survive a motion to dismiss.

### I. Violation of the Homeless Service Reform Act (Count XI)

The plaintiffs seek to add a new claim to their complaint, under the District of Columbia's Homeless Services Reform Act ("HSRA"), D.C. Code § 4-751.01 *et seq*.  But that Act expressly states that none of its provisions "shall be construed to create an entitlement (either direct or implied) on the part of any individual or family to any services within the Continuum of Care, other than shelter in severe weather conditions," as authorized in one particular provision. D.C. Code § 4-755(a); see also id. § 4-751.01(8) (defining "Continuum of Care" as "the comprehensive system of services for individuals and families who are homeless or at imminent risk of becoming homeless," including "shelter, transitional housing, permanent supportive housing, and supportive services").  The District of Columbia Court of Appeals has explained that in light of this "unambiguous[]" provision, "it is clear that there is only one statutory entitlement conveyed by the act, and that is shelter in severe or frigid weather."  Baltimore v. Dist. of Columbia, 10 A.3d 1141, 1151 (D.C. 2011).

"Severe weather conditions" under the HRSA means "whenever the actual or forecasted temperature, including the wind chill factor or heat index, falls below 32 degrees Fahrenheit or rises above 95 degrees Fahrenheit."  D.C. Code § 4-751.01(35).  The statutory entitlement to shelter in such conditions is found in D.C. Code § 4-754.11(5).  While the complaint alleges that unspecified former La Casa residents "and other homeless in the Columbia Heights area" were denied shelter during such conditions on February 21, 2011, see 2d Am. Compl. ¶ 63, the complaint pointedly does not allege that any of the current or proposed new plaintiffs were among those denied shelter during that night, nor do any of the declarations submitted by plaintiffs make such a claim.  The plaintiffs therefore cannot prevail on any claim under the HRSA based on the denial of shelter.

In their opposition to the District's motion to dismiss — although not in their proposed amended complaint or in their briefing on their motion to amend — the plaintiffs also allege that the closure of La Casa violated certain procedural rights under the HRSA, specifically the right to an administrative hearing.  See Opp. MTD at 13-14.  The D.C. Court of Appeals, however, has rejected virtually identical claims arising from the closure of another low-barrier shelter.  Baltimore v. Dist. of Columbia, 10 A.3d at 1152-53.  Contrary to the plaintiffs' argument, the HRSA does not create any right to a hearing before the closure of a shelter.  See id. The Court finds that the plaintiffs' proposed claim under the HRSA cannot survive a motion to dismiss.

### J.  Violation of Substantive Due Process (Count XII)

Finally, the plaintiffs seek to add a count for the violation of substantive due process under the United States Constitution, based on the District's alleged denial of their right

to housing.  2d Am. Compl. ¶¶ 158-59.  "Individuals are entitled to due process, however, only if they have a constitutionally protected property interest," Washington Legal Clinic for the Homeless v. Barry, 107 F.3d 32, 36 (D.C. Cir. 1997) (citing Brock v. Roadway Express, Inc., 481 U.S. 252, 260 (1987)), and the plaintiffs cannot derive any constitutionally protected interest in shelter either from D.C. statute or directly from the Constitution.  Baltimore v. Dist. of Columbia, 10 A.3d at 1154 (citing Lindsey v. Normet, 405 U.S. 56, 74 (1972)).  Even where such a property interest exists, "the doctrine of substantive due process constrains only egregious government misconduct," which this circuit has described as preventing only "grave unfairness," such as "'a substantial infringement of state law prompted by personal or group animus'" or "'a deliberate flouting of the law that trammels significant personal or property rights[.]'" George Washington Univ. v. Dist. of Columbia, 318 F.3d 203, 209 (D.C. Cir. 2003) (quoting Silverman v. Barry, 845 F.2d 1072, 1080 (D.C. Cir. 1988)).  The plaintiffs' claim for a violation of substantive due process cannot survive a motion to dismiss.

## IV.  CONCLUSION

For the foregoing reasons, the Court has determined that only the plaintiffs' claim for disparate impact based on race under the FHA (Count 3) can survive a motion to dismiss. Amendment of the plaintiffs' complaint therefore is not futile, in that the proposed second amended complaint adds plaintiffs and contains one viable count.  The Court therefore grants the plaintiffs' motion to amend their complaint but dismisses all counts of the second amended

complaint except Count 3.  The Court grants the defendant's motion to dismiss the existing

complaint.[18]  An Order consistent with this Opinion was issued on September 28, 2012.

SO ORDERED.

/s/
_____
PAUL L. FRIEDMAN
DATE:   October 4, 2012                          United States District Judge

_____

[18]        As an alternative means of achieving the same end, the Court could have granted in part and denied in part the motion to amend, while giving the plaintiffs specific instructions about which count(s) could appear in their amended complaint and directing them to file such a complaint in conformity with those instructions.  See, e.g., Fox v. District of Columbia, 851 F. Supp. 2d 20, 39 (D.D.C. 2012).  The Court has taken the more expeditious procedural route of granting the motion to amend in full — allowing the proposed complaint already submitted by the plaintiffs along with their motion to be docketed as the second amended complaint — while dismissing the counts that the Court has determined are deficient under Rule 12(b)(6).