_____

)
WILLIAM BOYKIN, et al.,         )
                           )
        Plaintiffs,         )
                           )
       v.             )        Civil Action No. 10-1790 (PLF)
                           )
VINCENT GRAY,          )
                           )
        Defendant.       )
_____ )

## OPINION

This matter is before the Court on the District of Columbia's motion to

dismiss, or, in the alternative, for summary judgment.[1]  The plaintiffs are a group of

homeless men who claim that the District's closure of La Casa Shelter, where they

frequently stayed, has caused a disparate impact on African Americans and Hispanics in

violation of the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601 et seq.  Based on this

alleged violation, the plaintiffs seek compensatory and punitive damages, as well as an

injunction requiring the District of Columbia to re-establish emergency shelter housing in

---

[1]      The papers reviewed in connection with this matter include the following:
the defendant's motion to dismiss, or, in the alternative, for summary judgment ("MSJ")
[Dkt. No. 78]; the plaintiffs' opposition ("Opp.") [Dkt. No. 85-2]; the defendant's reply
("Reply") [Dkt. No. 89]; the defendant's statement of material facts ("Def.'s Stmt. of
Material Facts") [Dkt. No. 78]; the plaintiffs' second amended complaint ("2d Am.
Compl.") [Dkt. No. 74]; the plaintiffs' exhibits to the second amended complaint [Dkt.
Nos. 74-1, 74-2]; additional exhibits submitted by plaintiffs [Dkt. Nos. 42-2, 84-1];
Declaration of Fred Swan, Nov. 29, 2010 ("Swan Declaration No. 1") [Dkt. No. 27-1];
Declaration of Fred Swan, Oct. 19, 2012 ("Swan Declaration No. 2") [Dkt. No. 78-2];
District of Columbia Draft FY 2011 Federal Payment Budget Justification ("Budget
Justification") [Dkt. No. 27-3]; Special Warranty Deed [Dkt. No. 27-5]; and additional
exhibits submitted by both parties, though not cited in this Opinion.

the area where La Casa was located.  2d Am. Compl. ¶¶ 80-81, 94-99.  In an earlier

decision denying the District's motion to dismiss this claim, the Court concluded that the

plaintiffs had plausibly stated a *prima facie* claim for disparate impact based on race

under the FHA.  See Boykin v. Gray, 895 F. Supp. 2d 199, 211-14 (D.D.C. 2012).

Having already analyzed the plaintiffs' claim under Rule 12(b)(6) of the Federal Rules of

Civil Procedure, and no new arguments having been proffered supporting dismissal, the

Court will address only the defendant's arguments for summary judgment.


## I.  LEGAL STANDARD

A motion for summary judgment must be granted if "the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the

movant is entitled to judgment as a matter of law."  Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 248 (1986); see FED. R. CIV. P. 56(a), (c).  A disputed fact is "material" if it

"might affect the outcome of a suit under governing law."  Holcomb v. Powell, 433 F.3d

889, 895 (D.C. Cir. 2006).  A dispute over a material fact is "genuine" if it could lead a

reasonable jury to return a verdict in favor of the nonmoving party.  See Scott v. Harris,

550 U.S. 372, 380 (2007); Holcomb v. Powell, 433 F.3d at 895.  A court making this

determination must avoid making any credibility evaluations of its own and must weigh

the evidence presented by each party in the light most favorable to the opposing party.

Anderson v. Liberty Lobby, Inc., 477 U.S. at 255; Czekalski v. Peters, 475 F.3d 360, 363

(D.C. Cir. 2007).

An opposition to a motion for summary judgment must point to genuine

issues of material fact supported by competent evidence beyond mere supposition.

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); see Smith v. Janey, 664 F. Supp. 2d 1, 7 (D.D.C. 2009) ("The non-moving party's opposition . . . must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations or other competent evidence setting forth specific facts showing there is a genuine issue for trial."). If the non-movant's evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. at 249-50; see Scott v. Harris, 550 U.S. at 380 ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is 'no genuine issue for trial.'") (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587). "[S]ummary judgment is required 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Paige v. DEA, 665 F.3d 1355, 1358 (D.C. Cir. 2012) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).

## II.  DISCUSSION

### A.  Disparate Impact Under the Fair Housing Act

In its earlier decision analyzing the plaintiffs' race-based disparate impact claim under a Rule 12(b)(6) standard, the Court articulated the basic governing legal framework. There, the Court noted that the D.C. Circuit is the only court of appeals that has not yet decided on the availability of disparate impact claims under the FHA. Boykin v. Gray, 895 F. Supp. 2d at 211. Each of the other eleven circuits has held that the statute affords plaintiffs the ability to prove FHA violations on the theory of disparate impact. 2922 Sherman Ave. Tenants' Ass'n v. Dist. of Columbia, 444 F.3d 673, 679 (D.C. Cir.

2006). On two occasions, our circuit has analyzed such claims under the assumption that they are cognizable, without deciding the question. See Greater New Orleans Fair Housing Action Ctr. v. U.S. Dept. of Housing & Urban Dev., 639 F.3d 1078, 1085-88 (D.C. Cir. 2011); 2922 Sherman Ave. Tenants' Ass'n v. Dist. of Columbia, 444 F.3d at 678-82.[2]

Other circuits have established a considerable body of case law analyzing disparate impact claims based on race under the FHA. These cases have developed two variants of disparate impact theory: "disproportionate effect" and "segregative effect." Boykin v. Gray, 895 F. Supp. 2d at 211-14. Under the first, "to prove a disparate impact claim . . . a plaintiff must first demonstrate that the challenged policy or practice has a disproportionate effect on a protected class." Id. at 211 (quoting 2922 Sherman Ave. Tenants' Ass'n v. Dist. of Columbia, 444 F.3d at 679). Under the second, "if [a decision] perpetuates segregation and thereby prevents interracial association it will be considered invidious under the Fair Housing Act independently of the extent to which it produces a disparate effect on different racial groups." Id. at 213 (quoting Graoch Assocs. # 33, L.P. v. Louisville/Jefferson Cnty. Metro Human Relations Comm'n, 508 F.3d 366, 378 (6th Cir. 2007)).

Demonstrating disparate impact under either framework, however, does not lead immediately to a defendant's liability under the FHA. Rather, after a plaintiff

---

[2]     On February 15, 2013, the United States Department of Housing and Urban Development issued a final rule establishing that disparate impact claims are cognizable under the FHA. 78 Fed. Reg. 11460 (Feb. 15, 2013) (codified at 24 C.F.R. § 100.500 (2013)). On June 17, 2013, the Supreme Court granted certiorari on this same question. Petition for Writ of Certiorari, Township of Mt. Holly, N.J. v. Mt. Holly Garden Citizens in Action, Inc., (No. 11-1507), granted in part by 133 S. Ct. 2824 (2013) (granting certiorari on Question 1: "Are disparate impact claims cognizable under the Fair Housing Act?").

has successfully proved a *prima facie* case, a court will then examine the defendant's conduct to determine whether there is sufficient justification for the disparate impact caused. There are "two leading tests" for this second step of the disparate impact inquiry under the FHA. See Greater New Orleans Fair Housing Action Ctr. v. U.S. Dept. of Housing & Urban Dev., 639 F.3d at 1085. The Second Circuit has adopted a "burden-shifting framework: once the plaintiff demonstrates that the challenged practice has a disproportionate impact, the burden shifts to the defendant to 'prove that its actions furthered, in theory and in practice, a legitimate, bona fide governmental interest and that no alternative would serve that interest with less discriminatory effect.'" 2922 Sherman Ave. Tenants' Ass'n v. Dist. of Columbia, 444 F.3d at 680 (quoting Huntington Branch, NAACP v. Town of Huntington, 844 F.2d 926, 935-36 (2d Cir.), aff'd on other grounds, 488 U.S. 15 (1988)). Under the Seventh Circuit's approach, the court engages in a "four-factor balancing test" in which it considers "(1) the strength of the plaintiff's showing of discriminatory effect; (2) whether any evidence indicates discriminatory intent; (3) the defendant's interest in taking the challenged action; and (4) whether the plaintiff seeks to compel the defendant to affirmatively provide housing to a protected class or merely to restrain the defendant from interfering with individual property owners who wish to provide such housing." Id. (citing Metropolitan Housing Dev. Corp. v. Village of Arlington Heights, 558 F.2d 1283, 1290 (7th Cir. 1977), cert. denied, 434 U.S. 1025 (1978)). "Our circuit has noted, however, that in some cases 'the success of plaintiffs' claim doesn't turn on the details of the legal test' because 'either approach requires proof of disproportionate impact, measured in some plausible way.'" Boykin v. Gray, 895 F.

Supp. 2d at 211 (quoting <u>Greater New Orleans Fair Housing Action Ctr. v. U.S. Dept. of Housing & Urban Dev.</u>, 639 F.3d at 1085).

At the motion to dismiss stage, the Court concluded that the plaintiffs had presented factual allegations that fell within the contours of a cognizable *prima facie* claim under both variants of disparate impact theory. <u>Boykin v. Gray</u>, 895 F. Supp. 2d at 211-14. The District of Columbia now argues that the plaintiffs have not offered evidence sufficient to support a reasonable jury's finding that the closure of La Casa Shelter caused a significant disparate impact — either disproportionate or segregative — on African Americans and Hispanics. <u>See</u> MSJ at 13-18. In addition, the District argues that even if the plaintiffs were able to make out a *prima facie* case, the District's decision to close La Casa does not violate the FHA under the tests of either the Second or the Seventh Circuits. <u>Id</u>. at 18-23.

### B. *Disproportionate Effect*

Our court of appeals has emphasized that success on a disparate impact claim "requires proof of disproportionate impact, measured in some plausible way." <u>Greater New Orleans Fair Housing Action Ctr. v. U.S. Dept. of Housing & Urban Dev.</u>, 639 F.3d at 1085. With that said, "no single test controls in measuring disparate impact." <u>Langlois v. Abington Housing Authority</u>, 207 F.3d 43, 50 (1st Cir. 2000) (citing <u>Watson v. Fort Worth Bank & Trust</u>, 487 U.S. 977, 995-96 n.3 (1988)); <u>see also</u> <u>Hallmark Developers, Inc. v. Fulton Cnty., Ga.</u>, 466 F.3d 1276, 1286 (11th Cir. 2006). The Court has previously noted that, in this case, a seemingly applicable framework for analyzing the plaintiffs' claim derives from decisions that "have held that where the population relying on or in need of housing assistance is disproportionately composed of racial

minorities, a decision adversely affecting the availability of that assistance has a disproportionate impact on a protected class." See Boykin v. Gray, 895 F. Supp. 2d at 211-12 (citing cases from several courts of appeals); see also Gallagher v. Magner, 619 F.3d 823, 833 (8th Cir. 2010) (establishing a *prima facie* case "requires showing 'that the objected-to action[s] result[ed] in . . . a disparate impact upon protected classes compared to a relevant population'") (quoting Darst-Webbe Tenant Ass'n Bd. v. St. Louis Housing Auth., 417 F.3d 898, 902 (8th Cir. 2005)) (alterations in original). In the specific context of this case, then, the test becomes, "[i]f a disproportionately high percentage of the homeless population in Washington, D.C., is minority, then action by the District adversely affecting that population could [make out a *prima facie*] claim for disparate impact." Id. at 212.

Accordingly, the plaintiffs focus the Court's attention on the fact that African Americans and Hispanics are overrepresented in the District's homeless population, compared to these groups' collective representation in the general population of Washington, D.C. See Opp. at 5, 13. Although the plaintiffs fail to cite to portions of the record on which this assertion is based, there is indeed evidence in the record to support it. The defendant, in its statement of material facts as to which it asserts there are no genuine issues, provides a relevant statistic, noting that "87.2% of the men served in shelters within the District of Columbia from May through October 2010 were African American or Hispanic." Def.'s Stmt. of Material Facts ¶ 3.[3] This percentage is to be

---

[3]     The District correctly points out, Reply at 3, that the plaintiffs have failed to comply with Local Civil Rule 7(h), which requires that oppositions to motions for summary judgment "be accompanied by a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the parts of the record relied

compared to data from the 2010 U.S. Census showing that 61.3% of the District's general population self-identifies as either African American or Hispanic.  Id. ¶ 5.  Based on this comparison, the plaintiffs argue that the closure of La Casa exerted a disproportionate adverse impact on African Americans and Hispanics.

At first glance, the plaintiffs' argument may bear similarity to the types of disparities that have led to findings of disproportionate effect in some other cases.  But upon closer scrutiny, it becomes evident that their simple comparison — unaccompanied by any further statistical evidence or analysis — does not provide the basis for such a finding in this case.  Cf. Gallagher v. Magner, 619 F.3d at 837 ("Statistics to prove discrimination 'come in infinite variety and . . . their usefulness depends on all of the surrounding facts and circumstances.'") (quoting Int'l Brotherhood of Teamsters v. United States, 431 U.S. 324, 340 (1977)) (alteration in original).  The fundamental defect in the plaintiffs' argument is that the adverse impact of which they complain was suffered not by the entire homeless population in the District of Columbia, nor even by a significant portion of its more than 6,000 members.  See Def.'s Stmt. of Material Facts ¶ 4 (stating results of annual Point in Time count for 2010).  Rather, the loss of La Casa Shelter — which had just ninety beds — was felt by a much smaller subset of that population.  This sort of "analytical cherry picking" pushes the disparate impact doctrine toward a level of granularity at which it loses its meaning.  See Greater New Orleans Fair Housing Action Ctr. v. U.S. Dept. of Housing & Urban Dev., 639 F.3d at 1087.  As the D.C. Circuit has explained in an analogous context:

---

on to support the statement."  Loc. Civ. R. 7(h).  Accordingly, the Court may treat factual assertions contained in the defendant's statement as conceded.  See McGaughey v. Dist. of Columbia, 740 F. Supp. 2d 23, 30 (D.D.C. 2010).

If the economic profiles of racial groups differ from parish to parish in the parts of Louisiana affected by hurricanes Katrina and Rita, then a grant formula that has non-disparate racial effects for Louisiana as a whole can easily have a disparate impact on African-American residents in at least some individual parishes (not to mention smaller geographic units).  To allow plaintiffs to pick a special subset of the affected localities to test for disparate impact would, just like allowing them to single out [] the effects of a single formula element, expose almost any grant formula to litigation.  Although plaintiffs focus much of their case on Orleans Parish, we must consider the impact on Louisiana as a whole.

Id. at 1086.

Similarly here, the shuttering of La Casa Shelter cannot be considered in isolation from its circumstances.  To do so ignores a crucial characteristic of the law of disparate impact, which is its focus on facially neutral *policies* that systematically exert discriminatory effects within the population to which they apply.  See, e.g., Gallagher v. Magner, 619 F.3d at 834 ("The first component of [plaintiffs'] prima facie case is an identifiable, facially-neutral policy or practice."); Tsombanidis v. West Haven Fire Dept., 352 F.3d 565, 574 (2d Cir. 2003) ("Disparate impact analysis focuses on facially neutral policies or practices that may have a discriminatory effect."); Oti Kaga, Inc. v. S.D. Housing Dev. Auth., 342 F.3d 871, 883 (8th Cir. 2003) (a plaintiff "must show a facially neutral policy has a significant adverse impact on members of a protected minority group").

The D.C. Circuit has usefully explained the distinction between discrete acts that affect individuals or small groups, and policies that are generally applicable and thus the more appropriate object of disparate impact analysis.  In 2922 Sherman Ave. Tenants' Ass'n v. Dist. of Columbia, 444 F.3d at 676-78, several tenants' groups alleged that the District, in executing a policy to aggressively enforce the city's housing code — dubbed the Hot Properties Initiative — subjected Hispanic residents to both disparate

treatment and disparate impact in violation of the FHA.  At trial, the tenants of one

building, located at 1512 Park Road, prevailed on their disparate impact claim.  The court

of appeals, in articulating the plaintiffs' theory of the case, clarified that "the policy the

tenants' disparate impact claim challenges is not the closing of 1512 Park Road — hardly

a policy, in any event — but the Hot Properties Initiative, specifically the use of the Hot

Properties List to determine which buildings to close.  Under the tenants' theory of the

case, the closing of 1512 Park Road is significant because it constitutes the injury they

suffered as a result of the Hot Properties Initiative."  <u>Id</u>. at 680 (citation omitted).

      The court analogized to the paradigm example of disparate impact in the

employment context, where an employer "refus[es] to hire a single individual based on

the results of an allegedly discriminatory test."  <u>2922 Sherman Ave. Tenants' Ass'n v.

Dist. of Columbia</u>, 444 F.3d at 680; <u>see also</u> <u>id</u>. at 679 (discussing <u>Griggs v. Duke Power

Co.</u>, 401 U.S. 424 (1976), the "seminal case" on disparate impact).  Such a plaintiff

would not be required to show that the employer's refusal to hire her "disproportionately

affected her protected class," as "such an inquiry would make little sense where the

employer's action affected only one person."  <u>Id</u>.  Rather, the plaintiff would have to

demonstrate that the *policy* that led to her individual injury — that is, the administration

of the test — caused a disparate impact on the protected class.  <u>Id</u>.; <u>cf</u>. <u>Huntington

Branch, NAACP v. Town of Huntington</u>, 844 F.2d at 934 ("There is always some

discrete event . . . which touches off litigation challenging a neutral rule or policy.").

      Here, the plaintiffs have failed to offer evidence that proves the existence

of any more general policy or practice that has adversely affected the District's homeless

population, of which the closure of La Casa was a constituent part.  They have failed to

show, for example, that this event was representative of a *general* decrease in the availability of shelter for homeless residents of the city; they have simply pointed to the loss of ninety beds of shelter housing in one location, where they had been accustomed to staying. In addition, many of the plaintiffs, in declarations submitted in support of their claim, have acknowledged their having found lodging in other shelters in the city after La Casa was shut down. See Pls.' Exhs. 1-2 [Dkt. Nos. 74-1, 74-2].

   The District, for its part, has argued that the closure of La Casa Shelter did occur as part of a broader shift in the District's policy toward its homeless citizens — but that the effects of this policy for the disproportionately minority homeless population have been, on the whole, positive rather than adverse. Specifically, it asserts that it has been pursuing a transition toward placing Permanent Supportive Housing ("PSH") — rather than emergency shelters — at the center of its approach to serving homeless residents. To support this assertion, it offers declarations from the District's top official in charge of homeless shelters, as well as an excerpt from the District's budget justification to the federal government for fiscal year 2011. See Swan Declaration No. 1; Swan Declaration No. 2; Budget Justification. The defendant has also offered evidence that between 2008 and 2010, the number of beds available to homeless persons in the District actually increased, due to its placement of over 600 men into Permanent Supportive Housing, balanced against its closure of two shelters, Franklin School and La Casa, which removed 390 beds from the District's shelter system. See Swan Dec. No. 1 ¶ 7. Finally, the District describes its plans for future expansion of the PSH program, which includes constructing 45 PSH apartments adjacent to the former location of La Casa. Swan Dec. No. 2 ¶ 4.

Although the plaintiffs have criticized the District's implementation of the PSH program on various grounds, they have not rebutted this evidence with evidence of their own. In their Second Amended Complaint, for example, the plaintiffs state that the PSH program has been operated without transparency, and that former residents of La Casa have been placed in housing that is distant from necessary social services. 2d Am. Compl. ¶¶ 69-71. In their opposition to the District's motion for summary judgment, however, they do not point to or proffer any evidence that counters the District's assertion, supported by a declaration from the responsible official, that the PSH program has yielded a net increase in the availability of housing for the homeless population. Instead, the plaintiffs repeatedly emphasize their disagreement with the analytical approach offered by the defendant, and assert that they will be able to prove disproportionate effect at some future time, perhaps with the aid of an expert. See Opp. at 5, 9-14. But the standard for summary judgment requires the plaintiffs to put forth competent evidence now, see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 586, to make "a showing sufficient to establish the existence of an element essential" to the proof of their case. Celotex Corp. v. Catrett, 477 U.S. at 322; see FED. R. CIV. P. 56(c). As the Court has explained, the plaintiffs point to no evidence currently in the record — other than the disproportionate representation of minorities in the District's homeless population — to demonstrate their ability to make such a showing. Rather, they have shown only that a very small subset of the homeless population was deprived of housing in one location.

As this Court noted in its earlier decision, the most relevant cases from the courts of appeals "involve government action affecting all persons within a community

who need low-income housing, and . . . these cases do not necessarily apply with equal force to government action that affects a much smaller portion of the community." Boykin v. Gray, 895 F. Supp. 2d at 212 n.11.[4]  The seminal Village of Arlington Heights case, for example, involved a challenge to the defendant village's refusal to rezone property on which the plaintiffs intended to build low-income housing.  Metropolitan Housing Dev. Corp. v. Village of Arlington Heights, 558 F.2d at 1285-86.  Although the particular housing development at issue involved just 190 townhouse units, the village's zoning decision would violate the FHA, the court held, if it "effectively foreclose[d] the construction of any low-cost housing within its corporate boundaries."  Id. at 1285-86. The court's decision was also based in part on the fact that the proposed development "would create a substantial number of federally subsidized low-cost housing units" in a village that "remain[ed] almost totally white in a metropolitan area with a significant percentage of black people."  Id. at 1288.  Similarly, in Keith v. Volpe, 858 F.2d 467 (9th Cir. 1988), cert. denied, 493 U.S. 813 (1989), the district court had found that the defendant city's failure to construct two housing developments "seriously jeopardize[d] the ability of a large number of minority residents to continue residing in [the City of Hawthorne]."  Id. at 483.

In Huntington Branch, NAACP v. Town of Huntington, 844 F.2d at 928, the plaintiffs challenged the defendant town's refusal to permit the construction of subsidized housing outside of an "urban renewal area."  The particular controversy involved just one proposed subsidized apartment complex, but the lawsuit implicated the

---

[4]    The Court added that, "[t]he smaller the affected population . . . the less readily it can be said that a racially disproportionate effect within that population affects housing options for the racial group as a whole."  Boykin v. Gray, 895 F. Supp. 2d at 212-13 n.11.

validity of the restrictive zoning ordinance generally. See id. at 928-29, 937-38. Accordingly, to determine disproportionate effect, the court considered town-wide statistics showing that African Americans were much more likely to depend on affordable rental housing. Id. at 929. A significant compounding factor in the court's reasoning involved the segregative effect of restricting low-income housing construction to an area with a high concentration of minority residents, particularly given that the town of 200,000 people was 95% white. See id.

Although the precise number of affected individuals relevant to the inquiry in this case is a matter of dispute between the parties, it is clear that the plaintiffs cannot seriously contend that the closure of La Casa exerted an adverse impact on the full homeless population of the city, let alone that it has significantly restricted housing options for people of color more generally.[5] Indeed, as the District has argued, while the plaintiffs and their fellow regulars at La Casa were adversely affected by the loss of this particular shelter, other homeless residents of Washington, D.C. — also disproportionately African American and Hispanic — had been afforded increased access to housing due to the District's policies. See Swan Dec. No. 1 ¶ 7 (describing net increase in availability of housing for homeless persons between 2008 and 2010, despite closure of La Casa in October 2010).

---

[5] The District identifies 114 individuals for this part of the analysis, which is the number of men who stayed at La Casa during the month preceding its closure. MSJ at 14 (citing Swan Declaration No. 2 ¶ 2). The plaintiffs do not dispute the accuracy of this measure, but they disagree with its materiality, arguing that the appropriate statistical analysis would include the "hundreds if not thousands of minority . . . men" who were served by La Casa during its existence, as well as an indeterminate amount of people who might be affected currently and in the future by its loss. Opp. at 7-8.

To summarize, although the plaintiffs' claim seems to fall within the broad outlines of disproportionate effect doctrine, given the disproportionately minority homeless population in the District of Columbia at large and in its shelters, the plaintiffs have not provided statistical information — or any evidence, for that matter — beyond that which was available at the motion to dismiss stage. In particular, they have not provided statistical argument or evidence to counter the District's evidence; consequently, there is nothing on which a reasonable jury could base a finding that the closure of La Casa Shelter constituted or was representative of a broader adverse impact suffered by the homeless population of Washington, D.C. See Frito-Lay, Inc. v. Willoughby, 863 F.2d 1029, 1033 (D.C. Cir. 1988) ("[T]he Supreme Court has unambiguously declared that the nonmoving party must 'go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file designate specific facts showing that there is a genuine issue for trial.'") (quoting Celotex Corp. v. Catrett, 477 U.S. at 324) (alteration in original) (internal quotation marks omitted). The Court does not doubt that for the men who considered La Casa to be their home, its removal was painful and disruptive to their lives; but this fact does not constitute evidence that a protected class of persons has been disproportionately affected in a manner cognizable under the FHA.

## C. Segregative Effect

The plaintiffs have also stated a claim under an alternative method of proving disparate impact, which requires demonstrating that a defendant's action "perpetuates segregation and thereby prevents interracial association." Boykin v. Gray, 895 F. Supp. 2d at 213 (quoting Graoch Assocs. # 33, L.P. v. Louisville/Jefferson Cnty.

Metro Human Relations Comm'n, 508 F.3d at 378).  As this Court has previously explained, the plaintiffs' basic argument is that the closure of La Casa fits into a pattern of the District's pushing homeless persons from the northwest quadrant of Washington — which holds its highest concentration of white residents — into the northeast and southeast quadrants of the city, which have predominantly African American populations. Id. at 213.  At the motion to dismiss stage, the plaintiffs made this claim without much evidentiary support, apart from demographic information about the racial composition of the District's various neighborhoods, alongside assertions — supported by declarations — that some former La Casa residents had been displaced to shelters located in areas with high concentrations of minority residents.  See id. at 213-14.  Although these factual allegations were sufficient to withstand a motion to dismiss for failure to state a claim, the Court warned the plaintiffs that "[w]ith respect to any segregative effect theory, proving the displacement of homeless persons will not suffice; rather, the plaintiffs will need to demonstrate that the closure of La Casa had a measurable impact on the racial composition of the city's wards or neighborhoods."  Id. at 214.

        As the District points out in its motion for summary judgment, however, the plaintiffs have failed to produce evidence on which a reasonable jury could make such a finding of measurable impact.  MSJ at 15.  The plaintiffs continue to rely primarily on the bare fact that La Casa was closed, and that the remaining low-barrier shelters for homeless men are located in predominantly minority areas.  See Opp. at 5-9; Pls. Exh. 5 [Dkt. No. 84-1].  Although the Court considered this scenario sufficient to state a plausible claim for segregative effect under a motion to dismiss standard, summary judgment should be granted if the plaintiffs' evidence is "merely colorable" or "not

significantly probative," as is the case here.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249-50.

To be sure, the plaintiffs argue that La Casa's closure took place within a broader context of "displacement across the city," Opp. at 7, which includes the District's closure of the Franklin School Shelter in 2008, the District's placement of homeless persons in Permanent Supportive Housing apartments located in predominantly minority areas, as well as the shifting demographics of the city.  See id. at 5-11; Pls.' Exh. 5 [Dkt. No. 42-2].  But the plaintiffs have failed to put forth the kind of supporting material that would demonstrate an ability to prove that La Casa's closure *caused* "a measurable impact on the racial composition of the city's wards or neighborhoods," Boykin v. Gray, 895 F. Supp. 2d at 214, such as by, for example, "showing that the numbers of homeless individuals in Wards 1 and 2 have significantly decreased, with a commensurate increase in the number of homeless residents of Ward 8," or "track[ing] . . . the dispersal of the individuals who used to populate La Casa."  Opinion, Boykin v. Fenty, Civil Action No. 10-1790 (Dec. 17, 2010), at 9 (denying the plaintiffs' motion for a preliminary injunction).  In addition, the District claims, with some evidentiary support, that it is establishing PSH apartments in more integrated areas, including on a portion of the site where La Casa used to stand.  See Swan Declaration No. 2 ¶ 4.

In short, the plaintiffs have not supplemented the record with any additional probative evidence since surviving the District's motion to dismiss.  Although they continue to describe a scenario in which the District's actions could plausibly perpetuate segregation, they have failed to produce any evidence on the basis of which a reasonable jury could find that such segregation has actually resulted from the closure of

La Casa, even considered in concert with the closure of the Franklin shelter and the implementation of the PSH program. This failure means that their claim cannot withstand a motion for summary judgment, given that "a disparate impact claim . . . require[s] plaintiffs to establish that the challenged policy *actually* had a disparate impact." 2922 Sherman Ave. Tenants' Ass'n v. Dist. of Columbia, 444 F.3d at 684; see also Pfaff v. U.S. Dept. of Housing & Urban Dev., 88 F.3d 739, 746 (9th Cir. 1996) ("To establish a *prima facie* case of discrimination without intent, the charging party must 'prove the discriminatory impact at issue; raising an inference of discriminatory impact is insufficient.'") (quoting Palmer v. United States, 794 F.2d 534, 538-39 (9th Cir. 1986)).

### D. The Seventh and Second Circuits' Tests for Liability Under the FHA

Although the Court concludes that the plaintiffs have failed to provide sufficient evidence on which a reasonable jury could find that they have proved their *prima facie* case, the Court also determines that, even if they had done so, the District would be entitled to judgment as a matter of law. "[T]he establishment of a *prima facie* case, by itself, is not enough to establish liability under the FHA." Mt. Holly Garden Citizens in Action, Inc. v. Township of Mt. Holly, 658 F.3d 375, 385 (3d Cir. 2011), cert. granted,133 S. Ct. 2824 (2013); see also Langlois v. Abington Housing Auth., 207 F.3d at 50; Metropolitan Housing Dev. Corp. v. Village of Arlington Heights, 558 F.2d at 1290 ("[W]e refuse to conclude that every action which produces discriminatory effects is illegal. Such a per se rule would go beyond the intent of Congress and would lead courts into untenable results in specific cases."). Accordingly, the courts of appeals have developed analytical frameworks for examining practices that produce disparate effects, to determine whether a defendant's causing such an effect warrants liability under the

FHA. As our own circuit has noted, there are "two leading tests," emanating from the Second and Seventh Circuits. See Greater New Orleans Fair Housing Action Ctr. v. U.S. Dept. of Housing & Urban Dev., 639 F.3d at 1085. The District of Columbia, in its motion for summary judgment, argues that it prevails under either approach. See MSJ at 18-23. The Court agrees.

1. The Second Circuit's Burden-Shifting Test

In Huntington Branch, NAACP v. Town of Huntington, 844 F.2d at 935-39, the United States Court of Appeals for the Second Circuit drew from employment discrimination jurisprudence, as well as from an earlier Third Circuit case under the FHA, to establish a burden-shifting approach for determining ultimate liability under the statute. The court held that, "once the plaintiff demonstrates that the challenged practice has a disproportionate impact, the burden shifts to the defendant to 'prove that its actions furthered, in theory and in practice, a legitimate, bona fide governmental interest and that no alternative would serve that interest with less discriminatory effect.'" 2922 Sherman Ave. Tenants' Ass'n v. Dist. of Columbia, 444 F.3d at 680 (quoting Huntington Branch, NAACP v. Town of Huntington, 844 F.2d at 935-36).

Here, the District of Columbia advances two justifications for its challenged conduct. First, the District claims that it had no choice other than to close La Casa and vacate the premises, because the underlying land was owned by a private entity, Donatelli Development. MSJ at 19-21. Second, it argues that closing La Casa was done pursuant to the District's implementation of its Strategic Action Plan to End Homelessness, which, according to the defendant, represents the considered policy

judgment of the District's government as to how it can best serve its homeless population.  Id. at 21-22.  The plaintiffs respond that "PSH programs were never intended to be mutually exclusive with the existence of low barrier shelters," and argue further that the arrangement of PSH placements for some homeless persons does not mitigate the need for low-barrier shelters to exist within the city.  Opp. at 14-16.  In addition, the plaintiffs assert that the existence of "any less discriminatory alternatives the District may have had remains a jury question."  Id. at 14.

The District's first argument is not supported by the evidence in the record.  Although it is true that, at the time of La Casa's closure in 2010, the land on which the shelter stood was owned by Donatelli Development, the plaintiffs note — correctly, it seems — that this situation stems from the District's own sale of the land to Donatelli in 2008.  See 2d Am. Compl. ¶¶ 46-47; Special Warranty Deed (conveying property to Donatelli for consideration of $10.00).  Thus, viewing the evidence in the light most favorable to the plaintiffs, a reasonable jury could find that the District's first justification fails as a "bona fide governmental interest," as the District apparently chose to sell the property with the knowledge that Donatelli intended to develop the land, which would, of course, necessitate La Casa's removal.

The District's second justification — that it closed the shelter pursuant to its broader policy on homelessness — has more merit.  When a disparate impact claim under the Fair Housing Act implicates government policy, the question is whether the challenged action furthers a legitimate, bona fide governmental interest or policy and that no alternative would further that interest or policy with less discriminatory effect.  See 2922 Sherman Ave. Tenants' Ass'n v. Dist. of Columbia, 444 F.3d at 680 (citing

Huntington Branch, NAACP v. Town of Huntington, 844 F.2d at 935-36); Langlois v. Abington Housing Authority, 207 F.3d at 51 (applying a variant of the Second Circuit's burden-shifting test, which requires a showing "that a demonstrated disparate impact in housing be justified by a legitimate and substantial goal of the measure in question").

The present case exemplifies the difficulties inherent in such an inquiry. The District of Columbia has argued that it is pursuing a long-term shift in its strategy for addressing homelessness, and, specifically, that the core element of this movement is to transition homeless persons away from reliance on emergency shelters and into Permanent Supportive Housing placements. MSJ at 22; Swan Declaration No. 1 ¶¶ 5-8; Budget Justification at 33-39 (describing "the District's goal of ending homelessness, by shifting from providing emergency services, in trailers, to the construction of homes integrated with services to meet the needs of the resident population"). In addition, the District has asserted that, given "limited fiscal resources for the homeless services program," any funds directed toward re-opening emergency shelter housing would necessarily draw money away from "other critically needed homeless services programs including the [PSH program]." Swan Declaration No. 1 ¶ 12. In sum, the District argues that its elected officials and administrative agencies "are best positioned to make policy judgments and to allocate resources to determine how best to meet the needs of their constituents." MSJ at 21.

The plaintiffs present a compelling point in response: placing some homeless residents into Permanent Supportive Housing does not preclude the maintenance of an adequate level of emergency shelter availability. Opp. at 14-16. Assuming that any reduction in shelter space exerts a disparate impact on minorities, it

follows that this adverse effect can be lessened by simply keeping all of the District's shelters open, while simultaneously expanding the PSH program.  See id.  At the very least, the plaintiffs argue, whether a less discriminatory alternative exists is a factual question, appropriate for resolution by a jury.  Id. at 14.  But the plaintiffs' argument directly implicates two main elements of the District's homelessness policy: the shift from emergency shelters to Permanent Supportive Housing, and the necessity of making tradeoffs between various types of services for homeless citizens, given limited resources.  The District has submitted a declaration from Fred Swan, the official responsible for overseeing the city's shelter program, in which he asserts that low-barrier shelters such as La Casa can perpetuate chronic homelessness, whereas by moving people into Permanent Supportive Housing, the District can further its goal of helping them escape homelessness and achieve self-sufficiency.  Swan Declaration No. 1 ¶¶ 5-8.  He also states that budget concerns dictate tradeoffs between different services for the homeless.  Id. ¶ 12.  The plaintiffs offer no evidence in response to Mr. Swan's declaration.

In cases where courts — applying the Second Circuit's balancing test or variants thereof — have found there to be genuine issues of material fact as to the existence of a less discriminatory alternative, the plaintiffs have offered evidence to support the existence of such alternatives.  For example, in Mt. Holly Garden Citizens in Action, Inc. v. Township of Mt. Holly, 658 F.3d at 377-81, a challenge was brought against the defendant township's execution of a redevelopment plan for a neighborhood that, according to the township, had become blighted.  Residents opposed the harsh manner of the redevelopment plan, which involved the demolition of a large number of

homes, and argued that they were effectively being pushed out of their own neighborhood.  See id.  The township justified its actions as necessary to alleviating blight; the plaintiffs then produced evidence, in the form of a report from a planning expert, "which stated that the 'blighted and unsafe' conditions could be remedied in a far less heavy-handed manner that would not entail the wholesale destruction and rebuilding of the neighborhood."  Id. at 386.  Although the defendant countered with statements from the township manager, the court of appeals held that "[t]hese contrasting statements, as well as the parties' continued arguments on appeal as to the cost and feasibility of an alternative relying on rehabilitation, create genuine issues of material fact that require further investigation."  Id. at 387.

Similarly, in Gallagher v. Magner, 619 F.3d at 828-30, the plaintiffs were owners and former owners of rental properties, who alleged that the City of St. Paul's aggressive enforcement of its housing code led to increased costs for property owners, which contributed to a shortage of affordable housing.  The city argued that its enforcement activities were justified by the goals of "providing minimum property maintenance standards, keeping the City clean and housing habitable, and making the City's neighborhoods safe and livable."  Id. at 837.  The court concluded that the city's conduct was "manifest[ly] relat[ed]" to these "legitimate, non-discriminatory objectives."  See id.  But at the third step of the analysis, the plaintiffs provided evidence of the existence of a less discriminatory alternative by pointing to a progress report from the city's previous program to enforce the housing code, which, according to the plaintiffs, "embodied a flexible and cooperative approach to code enforcement, which achieved the goals of code enforcement while maintaining a consistent supply of affordable housing."

Id. at 837-38.  The court of appeals concluded that, by providing evidence of the possibility of a less discriminatory alternative, the plaintiffs had demonstrated the existence of "a genuine dispute of fact regarding whether [the former program] was a viable alternative to the City's aggressive Housing Code enforcement practices."  Id. at 838.

        As already noted, with respect to the existence of less discriminatory alternatives, the defendant bears the burden of showing their unavailability.  See Mt. Holly Garden Citizens in Action, Inc. v. Township of Mt. Holly, 658 F.3d at 387.  The District of Columbia has put forth several persuasive arguments as to the necessity of closing some emergency shelters as part of its transitioning policy on homelessness.  Unlike the plaintiffs in Mt. Holly and Gallagher, however, the plaintiffs here have not produced any sort of substantive analysis or evidentiary material to counter the defendant's justifications.  They have done no more than to assert their view that the District could have kept La Casa Shelter open, while also expanding the availability of Permanent Supportive Housing.  Without more, the Court cannot conclude that a reasonable jury would have anything on which to base such a finding.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 586 (a party opposing summary judgment must raise genuine issues of material fact supported by competent evidence beyond mere supposition).

        Finally, the particular facts of this case place difficult policy judgments directly in issue, and implicate decisions about how the District government allocates benefits and burdens through its homelessness policy.  As this Court stated in its Opinion denying the plaintiffs' original motion for a preliminary injunction, "the Court has no

means of arriving at an answer" to the question of "[w]hat type of system best provides 'meaningful services and shelter'" to the homeless citizens of Washington, D.C. Opinion, <u>Boykin v. Fenty</u>, Civil Action No. 10-1790 (Dec. 17, 2010), at 12-13 (quoting the plaintiffs' motion). Although it is undoubtedly true that the District government is bound to uphold the Fair Housing Act in all its activities, including as it pertains to homelessness policy, the Court concludes that in this case, given the particular decision at issue and the District's asserted justification for taking it — and, most importantly, the plaintiffs' failure to offer evidence sufficient to raise a genuine issue of fact as to the existence of viable alternatives to the closure of La Casa — the District is entitled to summary judgment.

### 2. The Seventh Circuit's Four-Factor Balancing Test

In an early disparate impact case under the FHA, the United States Court of Appeals for the Seventh Circuit set forth its own four-factor test for determining liability under the FHA, given a plaintiff's success in proving its *prima facie* case. This test balances: "(1) the strength of the plaintiff's showing of discriminatory effect; (2) whether any evidence indicates discriminatory intent; (3) the defendant's interest in taking the challenged action; and (4) whether the plaintiff seeks to compel the defendant to affirmatively provide housing to a protected class or merely to restrain the defendant from interfering with individual property owners who wish to provide such housing." <u>2922 Sherman Ave. Tenants' Ass'n v. Dist. of Columbia</u>, 444 F.3d at 680 (citing <u>Metropolitan Housing Dev. Corp. v. Village of Arlington Heights</u>, 558 F.2d at 1290).

Here, with respect to the first factor, the District of Columbia argues that given the small number of people affected by the closure of La Casa, any disparate

adverse impact would be negligible.  MSJ at 20.  With respect to the second factor, the District asserts that there is no evidence of discriminatory intent.  Addressing the fourth factor, it admits to a lack of clarity in its understanding of the plaintiffs' desired remedy. Id.  The central focus of the District's argument is placed on the third factor — its interest in taking the action at issue.  Unsurprisingly, it offers two justifications for its conduct: first, that it was obligated to vacate the property on which La Casa stood, which was privately owned; and second, that closing La Casa was in keeping with the District's transition toward a PSH-focused homelessness policy.  The plaintiffs' basic response remains that the closure of La Casa was not necessary to the implementation of the District's new homelessness plan, and that the need for emergency shelter is still acute.

The Court has already explained why the plaintiffs' *prima facie* case must fail under either a disproportionate effect or segregative effect theory.  For much the same reasons, the Court concludes that even if the plaintiffs have made some showing of disparate impact, it is exceedingly weak.  With respect to the second factor, this Court has previously determined that the plaintiffs' evidence could not justify an inference of discriminatory intent, and therefore dismissed their claim for disparate treatment based on race.  Boykin v. Gray, 895 F. Supp. 2d at 207-09.  Since that dismissal, the plaintiffs have not supplemented the record with any new evidence that would change this determination.

The third factor in the analysis requires the Court to evaluate the quality and strength of the District's interest in closing La Casa.  As already noted, supra at 20, the District's contention that it had no choice but to close La Casa is undermined by evidence showing that the District itself sold the underlying land to Donatelli

26

Development in 2008.  But as also discussed, the District has described its conduct as a necessary element of its broader policy on homelessness.  It has argued that the decision to close La Casa was part of an ongoing transition away from emergency shelters and toward Permanent Supportive Housing.  Weighing the District's interest in taking the particular action at issue here would require the Court to pass judgment on this policy and the allocation of costs and benefits it entails.  Moreover, as explained supra at 24, the plaintiffs have not offered any evidentiary support for their argument that La Casa's closure was not necessary to the District's implementation of its plan.  In sum, the District has offered persuasive support for the proposition that its interest in moving resources from emergency shelters to Permanent Supportive Housing is strong, that decreasing people's dependence on emergency shelter housing is a part of that effort, and that the specific decision to close La Casa occurred as an element of this broader governmental policy.  The Court concludes, on the basis of the record before it, that the District's interest in closing La Casa, viewed in the context of its decision to make a shift in its approach to homelessness, outweighs any disparate impact the closure might have caused.

Finally, although the defendant expresses confusion as to what remedy the plaintiffs seek, it is clear that, beyond compensatory and punitive damages, the plaintiffs request an injunction requiring the re-establishment of low-barrier shelter housing in the neighborhood where La Casa was located.  2d Am. Compl. ¶¶ 80-81, 94-99.  Thus, they seek "to compel the defendant to affirmatively provide housing," rather than merely to prevent the defendant from impeding the private development of such housing.  See 2922 Sherman Ave. Tenants' Ass'n v. Dist. of Columbia, 444 F.3d at 680.  This factor, of

course, is also embedded in the preceding point about policy choices and the necessity of making difficult tradeoffs in allocating resources to the District's homelessness program. It weighs in favor of the defendant, and, ultimately, strengthens the Court's conclusion that the District is entitled to judgment as a matter of law.

### III.  CONCLUSION

For the foregoing reasons, the Court will grant the defendant's motion to dismiss, or, in the alternative, for summary judgment.

An Order consistent with this Opinion will issue this same day.

SO ORDERED.


/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE:  September 30, 2013